[Civ. No. 17677.   First Dist., Div. One.   June 9, 1958.]

AUDERIENE STROMAN, Respondent, v. THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY (a Corporation), Appellant.

Robert W. Walker, Richard K. Knowlton and Peart, Baraty & Hassard for Appellant.

Jarvis, Miller & Decker, Hugh B. Miller, Charles W. Decker and Martin J. Jarvis for Respondent.

PETERS, P. J.—Auderiene Stroman, on July 22, 1952, filed this action naming as defendants the Atchison, Topeka and Santa Fe Railway Company and several of its employees, and the Bay Cities Lodge Number 1039 of the Brotherhood of Railway and Steamship Clerks, an unincorporated labor union, and several of its officers. This complaint is entitled:

"Complaint for Damages for Conspiracy to Force Plaintiff out of Service of Defendant Atchison, Topeka & Santa Fe Railway . . . in Violation of Contractual Provisions." It contains detailed allegations in reference to the claimed conspiracy and asks for damages for the conspiracy alleged, claiming that such conduct violated the provisions of the collective bargaining agreement existing between the Santa Fe and the union. The Santa Fe's answer admitted the employment of the plaintiff, denied the conspiracy, denied any breach of the employment contract by it, denied any termination of such contract by it, denied that plaintiff had performed certain conditions precedent required by the employment contract, and alleged a breach of the employment contract by her.

During the trial the Santa Fe moved for a summary judgment on the ground that before filing suit plaintiff had not exhausted her administrative and contractual remedies. This motion was denied. Plaintiff then dismissed as to defendant A. B. Enderle, a Santa Fe employee who had died, and as to the union and its officers.

At the close of the presentation of the evidence, all of the individual defendants remaining in the case moved for a nonsuit on the ground that no conspiracy had been proved. These motions were granted, and all of the remaining individual defendants were dismissed from the proceeding. This left as the sole defendant the Santa Fe. The court denied its motion for a nonsuit. The court then granted plaintiff's motion for a directed verdict against the Santa Fe. This motion was granted, on the theory that the complaint not only alleged a conspiracy but also alleged a cause of action for damages for breach of the employment contract, and a wrongful discharge of plaintiff by the Santa Fe, and that the evidence showed, as a matter of law, that the Santa Fe had breached the contract of employment and wrongfully discharged the plaintiff without affording her a hearing and investigation as required by the collective bargaining agreement governing the terms of her employment. The court then submitted the question of the amount of damages to the jury and the jury assessed the damages against the Santa Fe at $40,000. The Santa Fe appeals from the judgment entered on that verdict. Its main contentions are that it was entitled to a summary judgment in that it appears as a matter of law that plaintiff did not, prior to filing suit, exhaust her contractual and administrative remedies as required by law, and that, in any event, the issue of liability should have been submitted to the jury for

the reason that the evidence in reference thereto is conflicting.

■ This being an appeal from a directed verdict, on all factual issues the evidence produced by appellant, and all reasonable inferences therefrom, must be accepted as true.

■ This court must view all of the evidence submitted in the light most favorable to appellant and must accept every inference in favor of appellant that can reasonably be drawn from the evidence. These rules are elementary.

■ Inasmuch as the complaint alleges a conspiracy, and the court ruled in granting the motions for nonsuit of the individual defendants that, as a matter of law, no conspiracy had been proved, the only theory that will support a judgment against the Santa Fe is that there was also involved a cause of action against that company for wrongful breach of the employment contract, that is, that respondent was wrongfully discharged in violation of that contract. Appellant contends that the complaint alleges no such cause of action. It is true that it is difficult to spell out such a cause of action from the complaint in precise language. The complaint but hints at and does not directly allege such a cause of action. But necessarily underlying the conspiracy allegations is the theory that the discharge was unlawful and in violation of the collective bargaining agreement. Moreover, the complaint is not the only document before us. There is also the Santa Fe's answer which discloses that the defendant was not misled by the complaint. It must have construed the complaint as including a cause of action for wrongful discharge in violation of the contract, because it denied any breach of the employment contract by it and denied that it had wrongfully terminated the admitted employment. Whatever doubt may have existed on this issue was set at rest at the time of trial. At that time the issue of whether plaintiff had or had not been discharged was fully developed by both litigants. It is too late now, under these circumstances, to complain that the issue was not before the trial court. It was.

It is undisputed that the employment relationship of plaintiff with the Santa Fe, at all times here relevant, was covered by an agreement between the Santa Fe and the Brotherhood of Railway and Steamship Clerks. This collective bargaining agreement purports to cover the working conditions and hours of service of the various persons, including plaintiff, covered by it. The trial court, in granting the directed verdict against the Santa Fe, was of the opinion that the evidence

showed, as a matter of law, that plaintiff had been discharged by the Santa Fe, and that under article IV of the collective bargaining agreement, the Santa Fe was required, before dismissing the employee, to afford her a formal investigation, and hearing.

Article IV of the collective bargaining agreement provides that an employee who has been in the employ of the company for 90 days or more "shall not be dismissed or otherwise disciplined without a formal investigation, which shall be promptly held, unless such employee shall accept such dismissal or other discipline in writing and waive formal investigation." The same section requires that prior to such formal investigation the employee shall be notified of the precise nature of the charge, and then provides for a hearing and for a transcript of such hearing, if desired. The article then provides for an appeal up to the highest official designated by the company to hear such appeals. The same article also provides that an employee who considers himself unjustly treated may have his complaint handled as a grievance up through the regular channels of appeal, but to avail himself of this procedure the employee must file his complaint with his superior officer within seven days of the occurrence of which complaint is made. As already pointed out, it was the theory of the trial court that the Santa Fe dismissed plaintiff without the formal investigation and hearing required by this article, and that this amounted, as a matter of law, to a wrongful discharge. Thus a verdict was directed on that issue. The Santa Fe contends that the evidence on the issue of wrongful discharge was in conflict and for that reason the issue should have been submitted to the jury. In this same connection Santa Fe also contends that the evidence is capable of being interpreted as showing that plaintiff, in fact, breached and repudiated the employment contract. These contentions require a reference to the evidence.

The record shows without conflict that plaintiff was employed by the Santa Fe from 1943 through March 7, 1949. As already pointed out, her working conditions with the company were governed by the collective bargaining agreement. That agreement provides for the seniority rights of employees and provides for the "bumping," or displacing of an employee by a qualified senior employee. An employee whose position is lost to him because of a reduction in force, abolishment of the position, or displacement by a senior employee in turn has the right to "bump" or displace a junior employee

holding a position within the senior employee's fitness, ability and qualifications.

So far as the present case is concerned, between 1943 and February of 1948 nothing occurred of any importance except that plaintiff gained the seniority of these years of service. In February of 1948 plaintiff was "bumped" off a job in the cashier's department, Job 124. Plaintiff then "bumped" a junior employee in the expense and billing department— Job 134. Plaintiff testified that this displeased Mr. Nesbitt, chief clerk of the freight agency. Nesbitt was named as a defendant but has been dismissed from the case. In May of 1948, Job 134 was abolished. A job such as this one is abolished by Nesbitt making such a recommendation to Linsley, the terminal freight agent, who in turn recommends it to Hobdy, chief clerk to the superintendent. Linsley and Hobdy were also named as defendants but also were dismissed from the case.

Plaintiff testified that when her job was abolished she wanted to "bump" a comptometer job but was discouraged by Nesbitt. She "bumped" Job 100, a billing job, and this made Nesbitt angry. Nesbitt accused her of making 201 mistakes on this job, whereas, in fact, she had only made one, and offered her a resignation to sign, but she refused to sign it. Nesbitt recommended to the superintendent of the department that plaintiff be penalized 10 demerits for each error, but no demerits were ever assessed. Plaintiff asked for a hearing on the charges but it was not given. In December of 1948 plaintiff decided to bid for Job 67-A, a car record clerk in the car desk department. She did not file this bid herself, but testified that she left it with another employee named Thelma Smith, and then went on her vacation. On January 15, 1949, she was informed by Nesbitt that she was assigned to the job and should report for work on January 17th, which she did. On January 24, 1949, she was told that Erma Crawford, another employee with seniority, would displace her as of January 31, 1949. Then plaintiff wanted to go back to her old job, numbered 100, but Nesbitt refused to let her do so. She submitted a written request for a temporary placement on Job 100 but her request was denied, and she submitted a bid for Job 100 on January 29, 1949, but her bid was not honored. The position was given to a junior employee. But on February 4, 1949, she successfully "bumped" another employee on Job 100, only to receive a notice from Nesbitt that the job was to be abolished on February 9, 1949.

On February 9, 1949, plaintiff asked to work on Job 91, secretary to Nesbitt and Linsley, but the request was denied. Plaintiff then told Hobdy that she had seniority over four employees on his staff, and had the right to "bump" them. Hobdy told her he would not let her "bump" into his office, and that she should shut up or be discharged for insubordination. On February 12, 1949, she "bumped" Job 10-A, a stenographer's job in Hobdy's office. When she started work on this job there were 228 pieces of back work on her desk, for which she was unjustly accused of being responsible. Moreover, she was unable to spend full time on the job because Hobdy would call her into his office and force her to just sit while he had long conversations on the telephone. He also had her try to find old files. Thus she only worked about half time at this job.

She also testified that on February 26, 1949, a Saturday, Hobdy told her not to work during the afternoon and then Hobdy and another employee ransacked her desk and compiled a list of back work for which he unjustly accused her of being responsible. Plaintiff complained to Enderle, the superintendent, who was originally named as a defendant but who died pending trial and was dismissed from the action, about Hobdy's activities and Enderle heard both sides in his office and after a heated discussion said there would be no formal hearing on the problem, and that if she wanted to go higher she should take the matter up with the general manager in Los Angeles. Her relationship with Hobdy worsened. On Saturday, March 5, 1949, he again gave her Saturday afternoon off and, with the employee plaintiff had "bumped" to get into Hobdy's office, again ransacked her desk and again prepared a backlog list. On that afternoon she came back to the office, not to work, but to see what Hobdy was doing. On March 7, 1949, she was given another backlog communication and was told that as of that date she was disqualified from that job. She demanded a formal investigation and hearing, but they were not granted.

She went home and did not return to the office until March 28, 1949. During this period she received no communication from the company about any new assignment. On March 28th she came to the office to get her pay check, and saw Hobdy. He asked her if she had received a registered letter he had sent her, and when she said she had not, asked her if she wanted a copy. She replied that she did, but none was furnished. She introduced into evidence this letter dated March

15, 1949, which was from Enderle to her assigning her to the job of relief car clerk in Oakland, and informing her that if she did not report for work in 14 days her seniority rights would be forfeited. She did not know about this letter until April 4, 1949, and no one telephoned her about this Oakland assignment. The hours on the Oakland job were eight hours each day, but the shifts changed so that on some days more than eight hours in a particular 24 hours were worked. Thus, the hours were: Saturday—7 a.m. to 3 p.m.; Sunday—3 p.m. to 11 p.m; Monday—8 a.m. to 5 p.m.; Tuesday—8 a.m. to 5 p.m.; Wednesday—8 a.m. to 5 p.m.; Thursday—11 p.m. to 7 a.m.; Friday—day off. It is obvious that in some periods of 24 hours this job would have required plaintiff to work more than eight hours. This violates section 1350 of the Labor Code which prohibits women from working more than eight hours in any 24-hour period.

Plaintiff also introduced into evidence, and places much reliance on, a form of the Santa Fe, numbered 1615-A, which relates to her. It is dated April 2, 1949, and states that plaintiff had voluntarily left the service of the company and that it would not be in the best interests of the company to reemploy her. Plaintiff claims that this form was false because she had never voluntarily left the employ of the company. She was never given a hearing on the facts contained in that form, and did not know about it until she learned that her name was not on the seniority list that came out in January, 1950. Shortly thereafter she discovered that she had been dishonorably discharged. She had talked with Enderle and Nesbitt a number of times asking if there was any work for her, but they did not tell her about the 1615-A form.

Plaintiff testified that she wrote a letter to Enderle on February 6, 1950, protesting the omission of her name from the seniority roster, and that she also wrote to the general manager in Los Angeles. She also asked the brotherhood, of which she was not a member, for aid but none was forthcoming. Admittedly, she made no attempt to place her case before the National Railway Adjustment Board.

Plaintiff testified that at no time were any demerits assessed against her. She admitted that in the document delivered to her on March 7, 1949, concerning the backlog in connection with her work. there was a notice that she had been disqualified from Job 10-A, and that she read this on March 8, 1949. She also admits that, when she came back to the office on

March 28, 1949, she did not ask Hobdy to reinstate her or to give her another position. She claims that she was unable to get a job until 1954.

This is a fair summary of the evidence of the plaintiff, and it would support a finding that plaintiff had been wrongfully discharged and not afforded the investigation and hearing called for by article IV of the collective bargaining agreement. If this evidence were the only evidence on the issue it would warrant a directed verdict for the plaintiff. But it is not the only evidence on the issue. In practically every important respect defendant produced evidence that directly or indirectly contradicted that of plaintiff.

Hobdy testified that plaintiff was a fair typist and a good transcriber, but that she constantly loafed on the job, frequently sitting at her desk and doing nothing. He denied telling plaintiff that he would disqualify her if she "bumped" into his office, or that she should not try to get into his office. When the employee in Job 10-A left that job there was no backlog, but during plaintiff's first week very little work was done by her. He did not put her to looking for old files, nor did he keep her in his office while he telephoned. On Saturday, February 26, 1949, he and the former occupant of the position made a check of plaintiff's work and discovered a big backlog. Incidentally, starting in November, 1948, the office was closed Saturday afternoons at 1 p.m., so that plaintiff was in error in stating that she was given Saturday afternoon off so Hobdy could check up on her work. When Hobdy tried to discuss the backwork with plaintiff, she simply argued. On the next Saturday afternoon another checkup demonstrated that plaintiff was still far behind in her work. On March 7, 1949, he told the plaintiff that she was being disqualified for that job because of her backlog of work. Plaintiff made no oral or written request for a hearing.

On March 28, 1949, when plaintiff came into the office to get her pay check, she refused to read a copy of the official notification sent to her by registered mail assigning her to the Oakland job, as of March 15, 1949, but he orally told her about the contents of that notice. Another employee of the Santa Fe overheard this conversation and agreed that Hobdy told plaintiff about the Oakland assignment. After she failed to protect the Oakland assignment, form 1615-A was prepared indicating that she had voluntarily left the employment. This form was not circularized among other railway companies, but was simply an office form for office use. Hobdy also testified

that he did not ever abolish a job simply because plaintiff held it.

Linsley, the terminal freight agent, who first hired plaintiff in 1943, contradicted plaintiff as to what he then told her about advancements, denied having assessed any demerits against her, and denied cooperating with other employees to have plaintiff lose her job. In his opinion, plaintiff was an efficient worker, and he had no prejudice against her. No job was canceled because plaintiff held it. Between March of 1947, and September of 1949, in fact, some 106 jobs were abolished because of lack of work caused by a drop in business. Twenty-four jobs were abolished in the first six months of 1949 for this reason. He never threatened to have plaintiff removed or disqualified, he did not have anything to do with the Oakland assignment, and he never told plaintiff that if she worked on a job it would be abolished. He did correspond with the superintendent about assessing demerits against her, and he did present to plaintiff a form waiving a hearing on these demerits, but when she refused to sign, no further action was taken. Plaintiff was not permitted to return to her job after her vacation because under then company rules she was not eligible for that job, which also precluded her from being assigned as his secretary.

Nesbitt, the chief clerk of the freight agency, denied that he planned with Erma Crawford to "bump" plaintiff from Job 67-A, and denied telling plaintiff she could not work in his office.

It will be remembered that plaintiff testified that she left a bid for Job 67-A with Thelma Smith, asking her to file it for her while plaintiff was on her vacation. Thelma Smith testified that plaintiff had never asked her to file a bid on her behalf.

The employee who was displaced by plaintiff on Job 10-A testified that when she left that job her work was up to date and there was no backlog.

Other evidence could be referred to, but that, in substance, is a summary of defendant's defense.

■ On this evidence, the trial court ruled, as a matter of law, that no conspiracy had been proved, and dismissed all of the individual defendants. The propriety of that ruling is not before us, plaintiff not having appealed. The trial court then granted a directed verdict against Santa Fe, holding that plaintiff was entitled, under article IV of the collective bargaining agreement to a formal investigation, and that, as a

matter of law, plaintiff was wrongfully and illegally dismissed from her job because no such investigation was afforded her.

There can be no doubt that, under article IV of the agreement, before the employer can dismiss or otherwise discipline an employee, there must be a formal investigation and hearing, and that without such investigation and hearing, a dismissal violates the terms of the collective bargaining agreement. There can also be no doubt that an employee may voluntarily leave the employment, or a job may be abolished, or an employee may be ''bumped'' by a senior employee, and that, in such event, no investigation or hearing is held. The question in the present case is whether or not there is a conflict in the evidence that should have been submitted to the jury on the issue of whether or not plaintiff was discharged in violation of the provisions of article IV. We think that there was such a conflict.

The trial court placed reliance on form 1615-A. That was an office form, for office use alone, and its contents were never communicated to plaintiff. While that form stated that plaintiff was no longer in the employ of the Santa Fe, it also stated that plaintiff had voluntarily left the service of the company. Other than this form no one told plaintiff that she was dismissed, and plaintiff admits that she did not learn about the form until sometime in 1950. There was evidence by defendant that would permit the jury to infer that after plaintiff was disqualified from Job 67-A, she simply stayed at home and made no effort to bid for another post or to displace another employee. Under these circumstances it was a jury question whether the 1615-A form and the removal of plaintiff's name from the seniority roster on January 10, 1950, constituted a discharge. Normally there cannot be a wrongful discharge unless by words or acts the employee is informed of his discharge. ■ In *Percival* v. *National Drama Corporation*, 181 Cal. 631 [185 P. 972], which involved an action for a claimed wrongful discharge, the court stated (p. 637):

''A discharge cannot be effected by a secret, undisclosed intention on the part of the master. It must be done by some word or act communicated to the servant. ■ 'No set form of words is necessary; but any words or acts which show a clear intention on the part of the master to dispense with the servant's services, and which are equivalent to a declaration to the servant that his services will be no longer accepted, are sufficient.' (26 Cyc. 987.)''

In the instant case there is no conclusive evidence that plaintiff was ever told that she was dismissed. So far as acts are concerned indicating a dismissal, the evidence is susceptible of conflicting inferences. Plaintiff testified that she called a number of times to ask if there was any work for her, and that she found out about the 1615-A form and the removal of her name from the seniority roster in January of 1950. But she also admitted that when she saw Hobdy on March 28, 1949, she did not ask him to reinstate her and to give her another position. Nor did she protest to the general manager of the company in Los Angeles, or seek the aid of the union, until 1950.

Unless plaintiff was discharged she was not entitled to suspend performance of her work. Section 1-h of article IV of the collective bargaining agreement provides: "Prior to the assertion of grievances as herein provided, and while questions of grievances are pending, there will neither be a shutdown by the employer nor a suspension of work by the employees."

Disqualification of plaintiff from a particular job did not permit her to suspend performance on her part. Article III, section 6 of the agreement provides, in part: "An employee disqualified under this Section may be removed from the position without following the procedure provided for discipline cases in Article IV of this Agreement, will retain all seniority rights under conditions stated in Section 13-b of this Article, will be permitted to bid on bulletined positions to which his seniority is applicable, but cannot displace any other employee because of such disqualification. An employee who considers he has been wrongfully disqualified under this Section may have his complaint handled as a grievance through the recognized channels of appeal. In the handling of that grievance, the affected employee shall have the right, if requested, of conference with his employing officer, either alone or with representatives of his choice, at which conference it will be the effort to dispose of the case based upon the facts and arguments there presented, but this will not prohibit full consideration of any facts and arguments thereafter presented by either party during the course of appeal."

It cannot be held as a matter of law that plaintiff's disqualification, as distinguished from dismissal, from her job was unjustified. There was a direct conflict on this issue. Hobdy testified as to plaintiff loafing on her job and of her failure to do her work. The employee who was displaced by plaintiff testified that she left no backlog of work. There is

evidence to the effect that in the first three weeks on this job the plaintiff accumulated a massive backlog of work.

There is much dispute over the assignment of plaintiff to the Oakland job. There is no doubt that on March 15, 1949, the Santa Fe sent plaintiff a properly addressed prepaid registered letter notifying her she had been assigned to Oakland. This letter was returned, unopened, to the Santa Fe on March 29, 1949. Why plaintiff did not, or would not, accept delivery, or why delivery was not made, does not appear. There is a direct conflict on whether plaintiff knew of this assignment. Plaintiff testified that she was not informed of it. Hobdy testified that he offered plaintiff a copy of the letter but that she refused to read it, and that then he orally told her about it. If Hobdy's testimony were believed by the jury it could have found that plaintiff, without voicing any objection, simply voluntarily refused to accept the Oakland job, and failed to report to the Oakland office.

Plaintiff attempts to meet this point by asserting that the Oakland assignment was a nullity because it violated the then provisions of section 1350 of the Labor Code prohibiting employment by transportation companies of female employees "more than eight hours during any one day of twenty-four hours." It is true that the Oakland assignment, because of the different starting times on various days of the week, required the employee on several occasions each work week to work more than eight hours in a single 24-hour period. Plaintiff also calls attention to a note to section 4 of article III of the agreement which provides: "It is understood that where Federal and State laws limit the number of hours or days per week for women employees, such employee may be considered as having her position abolished and may exercise her seniority rights as provided for in these rules to other positions when on the position occupied by her the requirements necessitate hours of service in excess of what is permitted under such laws."

Under this provision plaintiff argues that because the hours of the Oakland job violated the statutory laws of this state she had the legal right to consider that job "abolished," and so was under no duty to report. That is undoubtedly true. But it is also true that plaintiff did not assert this illegality at the time, nor did she make any effort to call it to the attention of the employer. Moreover, assuming that she could consider the Oakland job as having been abolished because of the illegal hours of employment, then she would have been

entitled to assert her seniority rights to displace another employee for whose job she was qualified. The evidence is conflicting as to whether she attempted to do so. The case should have gone to the jury for its determination whether her failure to take another post with the company was her own fault or that of the company. There was a clear conflict in the evidence and in the reasonable inferences therefrom, as to whether plaintiff was discharged by the Santa Fe, or whether she just voluntarily left the employ. This conflict should have been resolved by the jury.

Santa Fe not only contends that it is entitled to a reversal, but also contends that it is entitled to a judgment in its favor as a matter of law because, so it is asserted, the evidence shows without conflict that plaintiff failed to exhaust her contractual and administrative remedies conferred upon her by the collective bargaining agreement before filing this action. This, so it is claimed, is fatal to plaintiff's cause of action for breach of the employment contract.

Article IV, section 1-e of the agreement provides: ''The right of appeal by employees or their representatives in regular order of succession and in the manner prescribed, up to and including the highest official designated by the Company to whom appeals may be made, is recognized. . . .'' During the trial, the Santa Fe moved for a summary judgment on the ground that plaintiff had failed to ask for relief from the ''highest official designated by the Company to whom appeals may be made,'' and that such failure was fatal to her cause of action. In the affidavit of De Witt F. Todd, an officer of the company, filed in support of this motion, it is averred that the company has designated the vice-president of the operating department as the highest official to whom appeals can be made. This affidavit also avers that plaintiff did appeal to the general manager of the company, O. L. Gray, who denied the appeal, but that plaintiff failed to apply to the vice-president. In her counteraffidavit plaintiff admits that she did not appeal to the vice-president, but avers that she did not do so because Enderle and Hobdy told her that Gray was the highest designated official to whom her appeal might be taken, and that she relied thereon. She also averred that no one told her that a vice-president had been designated as the highest official to whom appeals could be taken.

In addition to the provisions of the collective bargaining agreement, the Railway Labor Act (45 U.S.C.A. § 153) creates the Railway Adjustment Board with certain powers over dis-

putes between employers and employees in the transportation industry, and particularly for a further appeal by the employee if he desires to go beyond the highest officer designated by the company. The section provides, in part:

"(i) The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on June 21, 1934, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.

"(j) Parties may be heard either in person, by counsel, or by other representatives, as they may respectively elect, and the several divisions of the Adjustment Board shall give due notice of all hearings to the employee or employees and the carrier or carriers involved in any disputes submitted to them."

The United States Supreme Court has ruled that under this statute an appeal to the adjustment board is not a condition precedent to filing a court action. (*Moore* v. *Illinois Central R. Co.*, 312 U.S. 630 [61 S.Ct. 754, 85 L.Ed. 1089].) In *Transcontinental etc. Air, Inc.* v. *Koppal*, 345 U.S. 653 [73 S.Ct. 906, 97 L.Ed. 1325], an employee of an airline brought an action against his company for a wrongful discharge under Missouri law. The court, in discussing the precise point here involved, stated that while the adjustment board had exclusive jurisdiction over certain disputes "that Board does not have like exclusive jurisdiction over the claim of an employee that he has been unlawfully discharged. Such employee may proceed either in accordance with the administrative procedures prescribed in his employment contract or he may resort to his action at law for alleged unlawful discharge if the state courts recognize such a claim. Where the applicable law permits his recovery of damages without showing his prior exhaustion of his administrative remedies, he may so recover, as he did in the Moore litigation, *supra*, under Mississippi law.

"On the other hand, if the applicable local law, as in Missouri, requires an employee to exhaust his administrative remedies under his employment contract in order to sustain his

cause of action, he must show that he has done so. Here respondent was employed by a carrier, subject to Title II of the Railway Labor Act, and his employment contract contained many administrative steps for his relief, all of which were consistent with that Act. Accordingly, while he was free to resort to the courts for relief, he was there required by the law of Missouri to show that he had exhausted the very administrative procedure contemplated by the Railway Labor Act. In the instant case, he was not able to do so and his complaint was properly dismissed.'' (P. 661.)

▉ The California law requires an employee to exhaust his administrative remedies under his employment contract before he may bring an action for damages for violation of such contract. (*Cone* v. *Union Oil Co.*, 129 Cal.App.2d 558 [277 P.2d 464]; *Hagin* v. *Pacific Gas & Elec. Co.*, 152 Cal. App.2d 93 [312 P.2d 356]; *Williams* v. *Pacific Elec. Ry. Co.*, 147 Cal.App.2d 1 [304 P.2d 715].)

▉ In the instant case it is undisputed that plaintiff failed to exhaust her administrative remedies provided in the collective bargaining agreement. She conceded that she had carried her protest only to the general manager in Los Angeles. She failed to take her protest to the vice-president designated by the company as the highest official to hear such protests. But this does not entitle defendant to a summary judgment as a matter of law. In plaintiff's affidavit in opposition to the motion for summary judgment she alleged circumstances which, if true, might excuse her failure to exhaust her contract remedies. She averred that Enderle and Hobdy informed her that the general manager in Los Angeles was the highest designated official to whom her appeal might be taken. If this is true, then the defendant is estopped from urging this defense. Underlying the proper interpretation of the collective bargaining agreement are certain fundamental principles of morality and fair play. While the company was under no duty to speak, when it did speak through its responsible agents, it was under a duty to speak the truth, and not to mislead the plaintiff to her damage. For this reason the trial court correctly denied the motion for a summary judgment.

In view of the fact that this case must be retried there are certain comments that should be made on this issue. Whether the company did make these representations and whether the company is estopped, presents a question of fact which should be submitted to the jury. If the jury should find that these

representations were not made and that the company is not estopped, then defendant would be entitled to a summary judgment. This is another factual issue that should have been submitted to the jury.

For these reasons the judgment appealed from must be and is reversed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied July 9, 1958, and respondent's petition for a hearing by the Supreme Court was denied August 6, 1958.