[L. A. No. 29553. In Bank. July 26, 1968.]

PORTLAND MASON, a Minor, etc., Plaintiff and Respondent, v. LYL PRODUCTIONS, Defendant and Appellant.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

Rosenfeld, Meyer & Susman and Peter R. Cohen for Defendant and Appellant.

Marvin M. Mitchelson and Martin Klass for Plaintiff and Respondent.

McCOMB, J.—Defendant appeals from a judgment awarding plaintiff $2,800 damages in an action for wrongful discharge of a child actress.

*Facts*: By a written agreement, dated January 2, 1962, defendant Lyl Productions (hereinafter referred to as "Lyl") employed plaintiff Portland Mason (hereinafter referred to as "Portland"), who at that time was 13 years old, to render, at Lyl's option, services as an actress to portray the role of "Marnie" in a weekly television series entitled "The New Loretta Young Show" and subtitled "Christine's Children."[1] It was stipulated at trial that the agreement was

---

[1] Portland's mother, Pamela Mason, as guardian, signed the contract on Portland's behalf; and she is guardian ad litem.

effective and controlled the rights and duties of both parties.

Under the agreement, Portland was required to abide by the time schedule of the studio and to render services as designated by the studio. Production costs were approximately $12,000 per day, indicative of a need for strict compliance with the working schedule requirements.

Portland was also obligated to furnish all modern wardrobe and wearing apparel reasonably necessary for the portrayal of her role, to the extent she possessed the same.

On July 23, 1962, the day prior to her discharge, Portland brought to the studio a large selection from her extensive wardrobe, but each item was rejected. The following day, she brought three more dresses, but they were likewise rejected shortly after the lunch break began.

Although Lyl's production report showed that the lunch break on July 24, 1962, the day of Portland's discharge, was from 12:30 to 1:30 p.m., John London, the producer, testified that it was called around 12:15 that day. It was uncontradicted, however, that the break was one hour in length.

Portland testified that immediately before the lunch break was called, she tried on and exhibited to Loretta Young, Mrs. Cline (the wardrobe mistress), and Mr. London the three outfits brought that day and that when this task was completed, the lunch break had already started. Loretta Young, Mrs. Cline, Mr. London, and Miss Gower (a domestic servant of Mrs. Mason's acting as a matron for Portland) testified that Portland tried on the clothes immediately after the lunch break was called.

Mr. London testified that after the rejection took place, he told Portland, in effect, that she should not worry and concern herself about the wardrobe differences, but should go to lunch. He then telephoned Portland's mother to resolve the issue as to wardrobe. Mrs. Mason was reached by telephone at the Beverly Wilshire Hotel, where she was having lunch, about 12:45 p.m., according to her public relations representative, and she agreed to appear at the studio with a suitable wardrobe at 4 p.m. After the call to Mrs. Mason, Mr. London went to the commissary for lunch.

While Mr. London was having lunch, Mrs. Mason talked with Portland over the telephone and became aware that the child was emotionally upset over the rejection. According to Mrs. Mason's testimony, she then spoke with Miss Gower over the telephone and instructed her to take Portland home for lunch. Mrs. Mason further testified that at the time she

instructed Miss Gower to take Portland home she did not know when the lunch break had been called or when afternoon rehearsals were scheduled to begin, although she knew the lunch break was taking place at the time of her call.

Miss Gower proceeded toward the parking lot to get the car and on the way met Mr. London returning from lunch. Mr. London testified that Miss Gower spoke first, informing him that Portland was upset and that Mrs. Mason had instructed her to bring the child home. According to his testimony, Miss Gower did not say she was taking Portland home ''to lunch.'' Miss Gower testified that Mr. London spoke first and asked where she was going; that she told him Mrs. Mason had asked her to bring Portland home during her lunch period; and that Mr. London asked her to wait until he talked with Loretta Young and then said, ''Just forget about it, we will just recast it,'' and asked Miss Gower not to mention it to Portland, but ''to let her mother tell her.'' Mr. London denied telling Miss Gower not to let Portland know she was being replaced. Mr. London placed this conversation with Miss Gower at a few minutes before 1 p.m.

Mr. London then went to Loretta Young's dressing room, where it was decided that if Portland left the studio premises, she would be replaced. Mr. London fixed the time of this decision at around 1 o'clock, with rehearsals to start at around 1:15 p.m. Loretta Young fixed the time at ''a little after 1 p.m., with rehearsals to start in five to ten minutes.''

Mr. London testified that he returned to Miss Gower, who was waiting, and told her, ''If you leave the premises, if you leave the stage, we are going to have to replace Miss Mason.'' Miss Gower replied, ''I am sorry, but I am taking orders from Mrs. Mason, and I have to leave the stage. I have to take her home.'' Mr. London replied, ''Well, then, we will have to replace her.'' Miss Gower's version of the conversation was that Mr. London gave her no choice in the matter but merely said they were recasting. Mr. London fixed the time of this conversation about 10 or 12 minutes after 1 p.m. Miss Gower and Portland left the studio immediately thereafter. Mr. London did not tell either Portland or Mrs. Mason that Portland was being replaced. Miss Gower, likewise, did not inform either of them of Mr. London's statements about replacing Portland.

Portland testified that the travel time between her home and the studio was about 20 minutes, but more likely to be 15 minutes ''judging most days, the way I raced to the studio.''

She further testified that on July 24 she arrived home "about a quarter to 1:00. . . . I looked at the clock when I got home." Her mother arrived 10 to 15 minutes later.

After Portland left the studio, Mr. London went to the commissary and told Mr. Murton, the casting director, to obtain a replacement for Portland. Mr. Murton fixed the time of this conversation at about 1:15 p.m. He contacted Celia Kay's agent, and Celia arrived at the studio about 2:15 p.m. Portland was not at the studio when rehearsals were scheduled to begin.

About 2:30 p.m., Robert Shapiro, Portland's agent, arrived at the studio. Around 1:15 p.m., Mr. London had telephoned him and asked that he be present when Mrs. Mason came to the studio with some wardrobe for Portland, in the event there were any problems. When Mr. Shapiro arrived, he was informed that Portland had been replaced. He telephoned Mrs. Mason's business manager, Mr. Fitzgerald, about 2:30 p.m. and so informed him, and Mr. Fitzgerald relayed the message to Mrs. Mason at the Beverly Wilshire Hotel. In one place in her testimony, Mrs. Mason fixed the time of this call at about 2:30 p.m. and in another place at between 12:30 p.m. and 1 p.m. When Mrs. Mason arrived home, she told Portland that she had been replaced.

Mr. Fitzgerald telephoned the studio at 4 p.m. to confirm the replacement and was advised by Mr. London that Portland was replaced "because she left the stage without permission." Celia Kay was thereafter employed to play the role intended for Portland.

Lyl's production report for the day of Portland's discharge shows: "Portland Mason's mother requested that she come home at 12:30 P.M. This was reported to the producer and she was replaced in the show."

The parties stipulated that no breach of contract existed by reason of the furnishing or nonfurnishing of wardrobe required by the contract, and the trial court so found.

Based on the evidence recited above, the trial court also found that Portland, then a minor under 14 years of age, was emotionally upset as the result of a wardrobe dispute with Lyl; that her mother was aware of the dispute and the emotional condition of her daughter; that Portland was told, in effect, by Mr. London, an authorized agent of Lyl, that everything would be all right and that she should go to lunch; that it was decided by Lyl that if Portland left the set for lunch, she would be replaced; that this order was not effectively

communicated to Portland or her mother or any other authorized agent prior to the time she left the set; that Portland left the set under these circumstances; and that during the lunch hour a unilateral decision was made by Lyl to replace her.

Included in the conclusions of law adopted by the trial court (all of which conclusions were incorporated by reference in the findings of fact), was one reading, as follows: "PRODUCTIONS, by their decision to replace PORTLAND MASON during the lunch hour and in that they were dealing with a minor who had cause to be emotionally upset and was in fact emotionally upset concerning the wardrobe incident. under said circumstances of July 23, 1962 and July 24, 1962, acted unreasonably in not allowing PORTLAND to go home during the lunch hour in order that she might regain her composure, resolve the wardrobe dispute and return to the studio without suffering the penalty of being replaced in the series and having her contract unilaterally terminated."

Question: *Does the evidence sustain the findings and judgment of the trial court?*

█ *Yes.* Regardless of whether Lyl's order for Portland not to leave the studio was communicated to her or her authorized agent prior to the time she left, Portland's act in leaving would not constitute grounds for terminating the contract if the order was an unreasonable one. In this respect, the trial court found that the order was unreasonable under the circumstances.

█ With respect to the determination of the reasonableness of such an order, the following rule set forth in *May* v. *New York Motion Picture Corp.,* 45 Cal.App. 396, 404-405 [4] [187 P. 785], is pertinent: "Where the reasonableness of the master's order depends upon undisputed facts, and the inferences from the facts found or admitted all point one way, the question as to the reasonableness of the order or rule is one of law for the court and not a question of fact for the jury. Where, however, the reasonableness of the order does not rest wholly upon undisputed facts, or its reasonableness is not so apparent that but one inference can reasonably be deduced from the proved or admitted facts, it is for the jury [in this case, the trial judge as the trier of fact] to determine whether the order is reasonable or not."

█ In the present case, as shown above, the evidence was conflicting, and the trial court determined, upon an abundance of evidence, that the order forbidding Portland to leave the studio during the lunch break was unreasonable under the

circumstances. Moreover, the evidence is susceptible to an inference that had Portland known she would be discharged if she left the premises, she would not have departed.

■ In *Yakov* v. *Board of Medical Examiners,* 68 Cal.2d 67, 72 [3] [64 Cal.Rptr. 785, 435 P.2d 553], this court said: " ' " ' In reviewing the evidence . . . all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. . . . When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' " ' "

Accordingly, since the judgment is substantially and properly supported by the evidence, the findings of fact, and the conclusions of law, it cannot be disturbed on appeal.

The judgment is affirmed.

Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

SULLIVAN, J.—I dissent. In essence the majority hold that " [r]egardless of whether Lyl's order for Portland not to leave the studio was communicated to her or her authorized agent prior to the time she left, Portland's act in leaving would not constitute grounds for [Lyl's] terminating the contract" because "the trial court determined upon an abundance of evidence, that the order . . . was unreasonable under the circumstances." One reads in vain the trial court's conclusion of law set forth verbatim by the majority immediately before such holding, in order to discover those words which, according to the majority express the determination of the court that "the order was unreasonable under the circumstances." Rather it appears that the court found[1] that PRODUCTIONS, *by their decision* to replace PORTLAND MASON during the lunch hour . . . acted unreasonably in not allowing Portland to go home during the lunch hour . . . without suffering the penalty of being replaced in the series and having her contract unilaterally terminated." (Italics added.) The only finding related to Mr. London's order is that one which states that neither Portland nor her mother was directly informed

---

[1]The language quoted by the majority is conclusion of law No. 3. However as the majority note, at the end of the findings of fact appears the following: "Each and every conclusion of law set forth hereinbelow is incorporated herein by this reference as though set forth in full as a conclusion [*sic*] of fact." Apparently the majority eschew any distinction between finding of fact and conclusion of law in respect to the quoted matter.

prior to Portland's leaving[2] that she would be replaced if she left the studio premises. Even assuming *arguendo* that the conclusion of law relied upon by the majority can be interpreted as a finding as to the unreasonableness of Mr. London's order, nevertheless, as will appear *infra,* such a finding is not determinative of the case.

The majority's position is basically untenable and without any support in the record because it completely ignores the material issues on which the case was tried and appealed and attempts to dispose of the appeal on a question which is irrelevant and moot. I advert briefly to the real issues in the case. An examination of the pretrial conference order, as read in connection with the pretrial statements incorporated therein by reference, and of the balance of the record, clearly demonstrates that the only issue in the trial court was whether or not Portland breached her contract by leaving the studio and by not being present at afternoon rehearsals or whether Lyl breached the contract by wrongfully discharging her.[3] The trial court made no findings on these issues.

On appeal defendant Lyl contends: (1) that there are no findings on the material issue of breach of contract and that the uncontradicted evidence and the findings of fact show that Portland committed two actual breaches of contract: (a) by disobeying London's order not to leave the studio and (b) by failing to be present for the commencement of the afternoon rehearsals; and (2) if *arguendo* Portland did not commit an actual breach, the judgment must be reversed because it cannot be ascertained from the findings whether or not Portland committed an anticipatory breach. Nowhere in their opinion do the majority set forth, or discuss, let alone resolve,

---

[2] The trial court found that ''Prior to her departure, no one directly informed her, PORTLAND, or PAMELA that if PORTLAND left the studio premises that she would be replaced.'' It further concluded that ''PRODUCTIONS, by notifying only LAHOMA GOWER, a domestic servant of the MASONS, that it was terminating said agreement, failed to notify the proper party to the contract, PORTLAND MASON.''

[3] Portland's contention as set forth in her pretrial statement was essentially ''that she was wrongfully discharged from employment and that defendant thereby and otherwise breached its agreement with plaintiff.'' Lyl's contention as set forth in its pretrial statement was essentially that ''Plaintiff materially breached her employment contract . . . by leaving the studio . . . and not being present when afternoon rehearsals commenced at or about 2 P.M. . . . .'' As the conclusions of law state, and the majority opinion notes, the parties stipulated in open court that neither Portland nor Lyl committed a breach concerning the furnishing or nonfurnishing of wardrobe; this was withdrawn as an issue at trial.

these crucial issues on appeal, which notably reflect the issues on which the case was tried.

Lyl's contention that Portland breached the contract by disobeying London's order not to leave the studio during the lunch hour must be rejected. London did not give this order to Portland personally or to any agent of hers authorized to receive it. As the uncontradicted evidence shows, and as the trial court found, this order was communicated to Portland's maid, Miss Gower, out of Portland's presence.[4] But the record is devoid of any evidence showing, or from which it can be reasonably inferred, that Miss Gower was Portland's agent in these matters or that she was at any time acting in the course and scope of any such agency. We do not have before us a case falling within the rule that the "knowledge of . . . an agent acting within the scope of his authority, is knowledge of his principal." (*Vanciel* v. *Kunle* (1945) 26 Cal.2d 732, 734 [160 P.2d 802]; see *Columbia Pictures Corp.* v. *DeToth* (1948) 87 Cal.App.2d 620, 630 [197 P.2d 580].) Accordingly, neither Portland nor her mother had actual or constructive knowledge that Portland should not leave the studio. Indeed, such was the trial court's finding. (See fn. 2 *ante.*) It necessarily follows that Portland could not have breached her contract by disobeying an order of which she had no knowledge.

I now turn to Lyl's contention that Portland breached the contract by failing to be present at the commencement of the afternoon rehearsals. It is beyond dispute that under the terms of her employment contract[5] Portland was required to

---

[4]Finding of fact No. 17 states: "On Tuesday, July 24, 1962, sometime between 12:30 p.m. and 1:10 p.m., LONDON informed LAHOMA GOWER again out of PORTLAND'S presence, that if PORTLAND were taken from the studio premises that she would be replaced in the show. LAHOMA GOWER replied to MR. LONDON that MRS. MASON had instructed her to bring PORTLAND home, that she would have to obey said instruction, whereupon, MR. LONDON requested that LAHOMA GOWER not inform PORTLAND that she would be replaced, but that she, LAHOMA GOWER, should let PAMELA MASON inform her daughter, PORTLAND, of the anticipated replacement."

[5]Portland contracted "to promptly and faithfully comply with all directions, requests, rules and regulations made or issued by [Lyl]." Her contract provides that her "failure, refusal or neglect, otherwise than by reason of [illness or mental or physical disability, governmental decree or order, or any other cause other than her own wilful act] to report or to render services to the full limit of your ability, as, when and wherever required hereunder, is sometimes herein referred to as '*default*' " (original italics) and that Lyl "shall . . . have the right to *terminate* this agreement . . . if . . . [b]. An event of default shall occur. . . .'' (Original italics.)

be on time for all rehearsals. Furthermore as an employee of Lyl she had a duty implied in law to comply substantially with all reasonable orders of Lyl (Lab. Code, § 2856; *May* v. *New York Motion Picture Corp.* (1920) 45 Cal.App. 396, 402-403 [187 P. 785] ; 3A Corbin on Contracts (1960) §§ 677, 679 ; 9 Williston on Contracts (3d ed. 1967) §§ 1013B, 1013C). It is equally beyond dispute that Portland intentionally failed to be present when the afternoon rehearsals began ;[6] nor did she at any subsequent time appear or offer to appear. A wilful disobedience of a reasonable order is a violation of a duty which justifies discharge of the employee.[7] (*Story* v. *San Rafael Military Academy* (1960) 179 Cal.App.2d 416, 417-418 [3 Cal.Rptr. 847] ; *May* v. *New York Motion Picture Corp., supra,* 45 Cal.App. 396, 403-404 ; *Bank of America* v. *Republic Productions, Inc.* (1941) 44 Cal.App.2d 651, 654 [112 P.2d 972] ; *Goudal* v. *C. B. DeMille Pictures Corp.* (1931) 118 Cal.App. 407, 411-414 [5 P.2d 432, 7 P.2d 174], Supreme Court approval withheld ; 32 Cal.Jur.2d, Master and Servant, §§ 23, 58 ; Lab. Code, §§ 2856, 2924.) Consequently Lyl was justified in discharging Portland for her wilful disobedience of the reasonable order to be present at the commencement of afternoon rehearsals.[8]

To avoid this result, however, Portland argues that before the afternoon rehearsals were scheduled to commence her employment contract already had been broken by Lyl when it

---

[6]It should be noted that the trial court made no finding as to when the afternoon rehearsal was scheduled to begin. Mr. London testified that the lunch break was called at 12:15 p.m. and the afternoon rehearsals were scheduled for 1:15 p.m., but the production report showed the break as having commenced at 12:30 and that afternoon rehearsals were called for 1:30 p.m. For the trial court's pertinent findings see fn. 4 *ante.*

[7]"A 'wilful' disobedience is an intentional disobedience. It does not necessarily imply any evil intent on the part of the servant or malice toward his master. . . . It amounts to nothing more than this : That the person knows what he is doing, intends to do what he is doing, and is a free agent. [Citations.]" (*May* v. *New York Motion Picture Corp., supra,* 45 Cal.App. 396, 404.)

[8]The termination would be justified on this basis even if another ground for Portland's dismissal had been given. "It is not necessary that an employer, in order to justify a dismissal, show that in dismissing his employee he in fact acted upon some proper ground of dismissal. It is sufficient if a ground of dismissal existed at that time. . . . Nor is it material that the employer assigned another ground as the cause of the employee's dismissal." (35 Am.Jur., Master and Servant, § 37, p. 471; see *Twentieth Century-Fox Film Corp.* v. *Lardner* (9th Cir. 1954) 216 F.2d 844 [51 A.L.R.2d 728], cert. den. 348 U.S. 944 [99 L.Ed. 739, 75 S.Ct. 365], reh. den. 348 U.S. 965 [99 L.Ed. 753, 75 S.Ct. 522]; Corbin on Contracts, *op.cit. supra,* § 762, pp. 526-527 ; 12 Cal.Jur.2d, Contracts, § 200, p. 418; see also *Earl* v. *Saks & Co.* (1951) 36 Cal.2d 602, 609 [226 P.2d 340] (rescission).)

discharged her during the lunch hour. However, the law is well settled that "A discharge cannot be effected by a secret, undisclosed intention on the part of the master. It must be done by some word or act communicated to the servant. 'No set form of words is necessary; but any words or acts which show a clear intention on the part of the master to dispense with the servant's services, and which are equivalent to a declaration to the servant that his services will be no longer accepted are sufficient.' (26 Cyc. 987.)" (*Percival* v. *National Drama Corp.* (1919) 181 Cal. 631, 637 [185 P. 972]; *Warner Bros. Pictures, Inc.* v. *Bumgarner* (1961) 197 Cal. App.2d 331, 353 [17 Cal.Rptr. 171]; *Stroman* v. *Atchison, T. & S.F. Ry. Co.* (1958) 161 Cal.App.2d 151, 161 [326 P.2d 155]; *Canavan* v. *College of Osteopathic Physicians & Surgeons* (1946) 73 Cal.App.2d 511, 521 [166 P.2d 878]; 32 Cal. Jur.2d, Master and Servant, § 55.) Consequently any unilateral decision to replace Portland made by Lyl during the lunch hour but not communicated to Portland could not as a matter of law have constituted a discharge.

As previously explained, Portland's discharge was not effectuated by London's statements to Miss Gower, the maid, who was not Portland's agent. (*Vanciel* v. *Kumle, supra,* 26 Cal.2d 732, 734; *Columbia Pictures Corp.* v. *DeToth, supra,* 87 Cal.App.2d 620, 630.) Any contention that London's efforts to obtain a replacement for Portland constituted a discharge also must be rejected. As noted in the majority opinion Celia Kay was not employed until after 4 p.m. on the day in question. Moreover, by the terms of Portland's employment agreement Lyl was not contractually obligated to actually use Portland's services.[9] Finally, as we have explained, a discharge could not have been effective until Portland had notice of it. The plain answer to Portland's argument is that she was *not* discharged during the lunch hour.

[9]Paragraph 26 of Portland's employment contract provides: "No OBLIGATION TO USE SERVICES: You [Portland] agree that we shall have no obligation to actually use your services or any of the results and proceeds thereof, or to produce, release, distribute or exploit the program or any pictures thereof, or to continue such distribution or exploitation if commenced, and you release us from any liability for loss or damage suffered by you by reason of our failure to do any of the foregoing. Nothing contained in this paragraph shall relieve us of our obligation to pay to you the minimum compensation herein provided with respect to any pictures for which we are or become committed to you hereunder, unless our obligation in connection therewith is cancelled pursuant to any of the provisions of this agreement. You agree that, subject to the provisions of this paragraph, we may employ any other person or persons to portray the role to be portrayed by you hereunder."

According to the trial court's findings "somewhere between 2:00 p.m. and 2:30 p.m., ROBERT SHAPIRO, one of the WILLIAM MORRIS agents, arrived on the set and was informed by MR. LONDON that PORTLAND had been replaced in the series." Portland now states in her brief: "Her duly appointed agent was Robert Shapiro of the William Morris Agency who was contacted by Mr. London of Productions and any message necessary to be imputed to Portland would have had to have been made through Mr. Shapiro." Therefore, the record before us requires the conclusion that as a matter of law Portland was discharged only when Robert Shapiro, a person authorized to represent her, was so informed by Mr. London. (*Vanciel* v. *Kumle*, *supra*, 26 Cal.2d 732, 734; *Percival* v. *National Drama Corp.*, *supra*, 181 Cal. 631, 637, and cases cited therewith *ante*.)

I would reverse the judgment as to those portions thereof appealed from.

Traynor, C. J., concurred.