[Civ. No. 25519. Second Dist., Div. One. Nov. 27, 1961.]

WARNER BROS. PICTURES, INC., Plaintiff and Appellant, v. JAMES BUMGARNER, Defendant and Appellant.

Freston & Files, Eugene D. Williams and Ralph E. Lewis for Plaintiff and Appellant.

Gang, Tyre, Rudin & Brown, Martin Gang and Frank G. Wells for Defendant and Appellant.

FOURT, J.—This is an action by Warner Bros. Pictures, Inc., hereinafter referred to as "Warner," for a declaration determining the status of a contract between Warner, as the employer, and James Bumgarner, also known as James Garner, hereinafter referred to as "Garner," as the employee. Garner cross-complained for damages for breach of the contract. The judgment declared the contract terminated as of March 10, 1960, and allowed Garner as damages the sum of $1,750. Both parties have appealed. Warner appeals ". . . from the judgment . . . and from the whole thereof." Garner appeals ". . . from that part of the judgment . . . to wit, Subdivision 3 providing that plaintiff and cross-defendant pay to defendant the sum of $1,750.00, with interest thereon at the rate of 7% per annum from March 10, 1960 up to the date of judgment. Defendant and cross-complainant does not appeal from the rest of the judgment as set forth in Subdivisions 1, 2 and 4 thereof."[1]

[1] The judgment provides in pertinent part as follows:

"WHEREFORE, by reason of the law and the findings of fact aforesaid, it is ORDERED, ADJUDGED AND DECREED as follows:

"1. That the written agreement dated February 27, 1959 between plaintiff and cross-defendant, therein called 'Producer,' and defendant and cross-complainant, therein called 'Artist,' is hereby declared termi-

A résumé of some of the facts is as follows:

Warner is a producer of motion pictures of different types for showing in theatres or on television. Garner is an actor who had been employed by Warner since 1955 under successive contracts, the latest of which, and the one with which we are here concerned, was made February 27, 1959, hereinafter referred to as "Garner Contract." The Garner Contract, among other things, contained a so-called *force majeure* clause.[2]

nated and ended as of March 10, 1960 and defendant and cross-complainant James Garner, herein called 'defendant,' is free of any obligation whatever to perform any term or condition set forth in said written agreement.

"2. That plaintiff and cross-defendant take nothing herein.

"3. That defendant have judgment against plaintiff and cross-defendant and plaintiff and cross-defendant pay to defendant the sum of $1,750.00, with interest thereon at the rate of 7% per annum from March 10, 1960 up to the date of this judgment.

"4. That defendant recover his costs and disbursements incurred in said action amounting to the sum of $1244.30."

[2]Clause 15 of the Garner contract provides:

"15. *Force Majeure*: If the preparation, production or completion of motion pictures by Producer or any person to whom the services of Artist are loaned shall be prevented or materially hampered or interrupted by reason of any fire, flood, explosion, earthquake, epidemic, casualty, strike, lockout, boycott, labor controversy, riot, civil disturbance, accident, act of God, war (whether or not officially declared), embargo or delay of a common carrier, or by any present or future municipal, county, state or national statute, ordinance, law, regulation or order, or by any executive or judicial order, whether municipal, county, state or national, or by any other legally constituted authority (whether or not any of the foregoing shall be constitutional), or by any other cause or causes of the same or other kind or character beyond the control of Producer, or by reason of the Producer's inability to obtain material, transportation, power or other essential commodity required in the conduct of its business, or if the production of any motion picture or other production to which Artist is assigned hereunder shall be suspended, interrupted or postponed by any such cause, or by the death, illness or incapacity of the director or any principal member of the cast, other than Artist (the continuance of any such event being hereinafter designated as the 'casualty period'), then, during the continuance of such casualty period, Producer shall not be obligated to make any weekly payments to Artist under Paragraph 3 hereof, and Artist, during the period of such nonpayment, shall not be obligated to render services hereunder. It is further agreed that if the majority of the motion picture theatres in the United States from which Producer, directly or indirectly, derives revenue from use of its motion pictures produced primarily for theatrical exhibition shall be closed for any reason referred to in this paragraph 15 for a period of a week or more and if, at the time involved, Artist shall be rendering his services primarily in connection with such theatrical motion pictures; or, if the majority of television stations in the United States from which Producer, directly or indirectly, derives revenue from the use of its motion pictures produced primarily for television exhibition shall be closed for any reason referred to in this paragraph 15 for a period of a week or more, and if, at the time

Effective mid-January 1960, the Writers Guild of America, West, Inc. declared a strike against Warner and many other producers. The writers' guild is an organization or union composed of the writers of scripts or screen plays for both theatrical and television motion pictures. The strike continued from January until June 20, 1960.

The present controversy arose when Warner, on March 2, 1960, regarded the situation as of that time as a casualty within the *force majeure* clause and notified Garner that as of March 3, 1960, his compensation would be discontinued by reason thereof.

The chronology of significant dates is as follows:

*January 16, 1960*—Television and feature writers struck against many feature and television producers, including Warner.

*March 2, 1960*—Warner elected to suspend payment of compensation to Garner alleging existence of a "casualty period" under the employment contract.

*March 8, 1960*—Garner objected to suspension claiming that no casualty period existed and demanded payment of salary.

*March 9, 1960*—Warner refused to pay salary after Garner's demand.

*March 10, 1960*—Garner informed Warner that Warner was in breach of contract and that he elected to treat employment contract as terminated.

*June 20, 1960*—Writers' guild strike ended.

When the writers' strike commenced Warner was producing ten television programs or series. A series consisting of suc-

---

involved, Artist shall be rendering his services primarily in connection with such television motion pictures; then, in either of said events, Producer shall not be obligated to make such weekly payments for a period equivalent to the length of time said theatres or television stations, as the case may be, shall be closed for such reason, and such period shall be included in the casualty period within the purview hereof.

"If any casualty period should continue for a period in excess of eight (8) weeks, either Artist or Producer may elect to terminate Artist's employment hereunder; provided, however, that should Artist desire to terminate the employment, Artist shall serve written notice of such desire upon Producer, and if Producer should resume the weekly payments to Artist hereunder, commencing as of not later than one (1) week after receipt of such notice from Artist, Artist's employment hereunder shall not be terminated, but shall continue in full force and effect; and provided further, that Producer may, at any time during the continuance of the casualty period in effect when such weekly payments were resumed, terminate Artist's employment hereunder. If, however, Producer should not resume such weekly payments, as aforesaid, the employment of Artist hereunder shall be terminated."

cessive episodes involving the same main characters and exhibited on television at weekly or other regular intervals. One of such series was known as "Maverick," with Garner as one of the main characters therein.

Each television episode was a motion picture filmed from a script. A script is in the form of a play with dialogue, and of the correct length to make the required episode. Scripts are written from stories, the latter being basic literary material. A script is the working tool. Scripts are the product of screen writers, and practically all of such script writers are members of the screen writers' guild.[3] Stories are furnished to such writers by the producing company and form the basis of the required script.

On March 31, 1960, Warner filed its "COMPLAINT FOR DECLARATORY RELIEF," which set forth in pertinent part:

"XV

"An actual controversy exists between plaintiff and defendant as follows:

"(a) Plaintiff contends that it had and has the right to invoke the provisions of paragraph 15 [i.e., 'Force Majeure' clause set forth in fn. 2] . . . in that plaintiff has been and is now prevented and materially hampered and interrupted in the preparation, production, and completion of motion pictures by reason of said strikes hereinabove referred to[4] and, particularly, without limiting the generality of the foregoing, that the production of motion pictures to which defendant Garner has been and now is assigned, to wit, the 'MAVERICK' television films, has been and now is suspended, interrupted, and postponed by reason of said strike, affecting writers; and that, therefore, plaintiff is, under the express provision of said paragraph 15, not obligated to make any weekly payments to the defendant during the period that said conditions prevail, except as expressly provided in said paragraph 15. Defendant denies each and all of plaintiff's contentions set forth in this subdivision (a) and contends that by failing to make payment of the weekly payments provided for in said contract, plaintiff has committed a 'total breach' of said contract, giving

---

[3]During the screen writers' strike, some members of the screen writers' guild continued to write, using the anonymous name of "W. Hermanos."

[4]On or about February 29, 1960, the Screen Actors Guild, Inc., called a strike to become effective March 7, 1960, affecting all actors engaged in the production of motion pictures produced primarily for theatrical exhibition. Said strike did not affect actors engaged in the production of television films.

defendant the right to terminate said contract and seek other employment in the field of entertainment.

"(b) Plaintiff contends that even if this court should ultimately find as a fact that plaintiff has not been prevented, materially hampered, or interrupted in the preparation, production, or completion of motion pictures by reason of said strikes, or that the production of said 'MAVERICK' television films has not in fact been suspended, interrupted, or postponed by reason of said strikes affecting writers, plaintiff's action in invoking said paragraph 15 was taken in good faith and in reliance on said express contractual rights and remedies, and that plaintiff can not be held to have committed a 'total breach,' or any breach at all, of said contract for its reliance, in good faith, upon its express contractual rights and remedies, unless plaintiff should, after the aforesaid question of fact has been finally determined adversely to plaintiff, fail and refuse to make payment of sums actually found to be due under said contract. In this connection, and in order to demonstrate plaintiff's good faith, and assure defendant and this Court thereof, plaintiff hereby offers to deposit with the Clerk of this Court, or any other person, firm, or corporation designated by this Court, such unpaid amounts as would have accrued under said contract up to the date of the filing of this complaint, but for the facts and circumstances herein described, together with all subsequently accruing amounts, such deposit to be disposed of in such manner as this Court may direct. Defendant denies each and all of plaintiff's contentions set forth in this subdivision (b) and contends that immediately upon the making of a contention or statement of opinion as to the facts by defendant, which is at a variance with plaintiff's belief as to the facts, plaintiff is required to either concede to defendant's opinion and demand, or proceed at its peril.

"(c) Plaintiff contends that even if this Court should hold adversely to plaintiff with respect to subdivision (b) above thereby finding, in effect, that plaintiff has breached said contract, such breach is only a partial breach with respect to a relatively insignificant amount of money, compared to the aggregate amount earned and to be earned by defendant; that plaintiff is financially able to pay any amount found to be due; that defendant has a plain, speedy, and adequate remedy by way of recovery of amounts found to be due; that such breach if such exists, is not of such a material

nature as to justify rescission or termination of said contract by the defendant; and that it would be unfair, inequitable, and unconscionable to permit defendant to terminate said contract, thereby depriving plaintiff of the value thereof, which plaintiff has developed over the period of five (5) years preceding the filing of this action, at great expense and effort and at no cost to defendant. Defendant denies each and all of plaintiff's contentions set forth in this subdivision (c) and contends that any failure to make weekly payments to him under said contract, however insignificant in amount, and even though its obligation to make such payments is disputed, is a material breach of contract giving him the right to terminate said contract and seek other employment in the field of entertainment.

"(d) Plaintiff contends that the acts and conduct of defendant over the period of a year or more, prior to the filing of this action, demonstrate conclusively that defendant is dissatisfied with said contract; that he has been seeking an excuse to avoid, rescind, nullify, cancel, or terminate the same; that by taking the action herein described, defendant is acting in bad faith, and in breach of his clear obligation under said contract; that by reason thereof, defendant is in default under said contract within the purview of paragraph 16 thereof; and that, therefore, in addition to plaintiff's right and remedies under paragraph 15 of said contract, plaintiff is not obligated to make any weekly payments to defendant during the period commencing on the commencement of said default, to wit, March 10, 1960, and continuing thereafter until defendant shall personally report to plaintiff ready, able, and willing to resume his services pursuant to said contract and for such additional period, not in excess of six (6) weeks, as may be necessary to enable plaintiff to prepare for the actual utilization of such services; and that plaintiff has all other rights and remedies against defendant more particularly set forth in said paragraph 16. Defendant denies each and all of plaintiff's contentions under this subdivision (d).

"(e) Plaintiff contends that in addition to its rights and remedies hereinabove referred to, under the provisions of the Producers-Screen Actors Guild, Inc. Basic Agreement of 1952, . . . said contract is automatically suspended as to both services and compensation while said strike called by Screen Actors Guild, Inc. is in effect, except to the extent, if any, that defendant may actually render services in connection with television films during the continuance of said

strike, or other services not within the jurisdiction of said Screen Actors Guild, Inc.

"Defendant denies each and all of plaintiff's contentions set forth in this subdivision (e) and contends that because he has been assigned to render services in television films said provisions have no application to him. In this connection, however, plaintiff calls attention to the provisions of paragraph 3 A of said contract requiring plaintiff to utilize the services of defendant in theatrical motion pictures and to the provisions of paragraph 4 of said contract to the effect that plaintiff is not deemed to have waived the right to require defendant to render any services mentioned in said contract by assigning defendant Garner to any particular kind or type of services over any period of time."

On April 14, 1960, defendant Garner, among other things,[5] filed his "ANSWER" and alleged therein in pertinent part:

"XV

"Answering paragraph XV [i.e., set forth above], defendant admits that plaintiff's contentions are as set forth in paragraphs XV(a) through XV(e) therein and that defendant denies each and all of plaintiff's said contentions. In connection with defendant's contentions in paragraph XV(a) through XV(e), defendant contends that, as of March 3, 1960, plaintiff did not have the right to invoke the provisions of Paragraph 15 of the employment agreement between the parties; that as of said date the production of the 'Maverick' television series was not suspended, interrupted, or postponed by reason of the Writer's [sic] strike, that as of said date plaintiff was not materially hampered or interrupted in the preparation, completion or production of motion pictures for exhibition in theatres or on television; that as of said date plaintiff could have immediately secured employment for defendant as an actor, pursuant to Paragraph 13 of the employment agreement, with numerous persons, firms, or corporations connected with the field of entertainment; that plaintiff could itself have made use of defendant's services in television productions and in other fields of entertainment; that by reason of plaintiff's letter of March 2, 1960, to defendant terminating plaintiff's weekly payments to defendant and by

[5]Defendant Garner also filed a "CROSS-COMPLAINT (Damages for breach of contract and interference with prospective contractual relations; Injunction)." On April 26, 1960, Garner filed his AMENDED CROSS-COMPLAINT (Damages for breach of contract; Injunction)."

reason of the fact that on or about March 9, 1960, plaintiff refused to make such payments after demand by defendant's attorneys, plaintiff has committed a breach of contract such that defendant is no longer bound to perform any or all of the terms and conditions of the agreement . . .''

The ''PRE-TRIAL CONFERENCE ORDER'' was filed September 20, 1960, and provides in pertinent part:

''This is an action in declaratory relief wherein plaintiff [i.e., Warner] seeks to have it determine [sic] whether or not plaintiff was justified in suspending the payment of compensation to defendant as an actor because of the pendency of a screen writers [sic] strike and whether plaintiff is entitled to an injunction to prevent defendant from working for any employer other than plaintiff. Defendant has filed an answer and an amended cross-complaint for damages for breach of contract on the part of cross-defendant and for an injunction to prevent cross-defendant from interferring [sic] with his employment by others.''

The order also incorporated a ''JOINT PRE-TRIAL STATEMENT'' which indicates that the contentions of the respective parties are set forth in paragraph XV of the complaint and paragraph XV of the answer thereto (see *supra*). The issues of fact are set forth in the joint statement as follows:

*Warners contends* that the issues of fact involved in this case are as follows:

''(a) Was the preparation, production or completion of motion pictures by Warners prevented, materially hampered or interrupted by reason of the writer's [sic] strike?

''(b) Was Warners unable to obtain material (namely scripts) by reason of said strike or,

''(c) Was the production of the 'Maverick' series to which Garner was assigned, suspended, interrupted or postponed by said strike?

''*Warners further contends* that if it be found that any one or more of the foregoing conditions did exist, then Warners is entitled to a declaration of its rights in the light of such facts; if one or more of the said conditions did not exist, then Garner is entitled to a declaration of his rights in that respect. In either event Warners contends that Garner is not entitled to rescind or revoke his contract by reason of any claim or breach thereof consisting of Warners' [sic] efforts to assert its rights under the provision of the contract.

''*Garner contends* that the issue of fact is as follows: as of March 3, 1960, did the circumstances resulting from the

writer's [*sic*] strike (including, but not limited to, the effect of said strike on the 'Maverick' television series, on Warners television and theatrical production generally, and on Warners ability to loan out Garner's services to other persons, firms, or corporations in the field of entertainment), give Warners the right, at that time, to suspend payments to Garner under the provisions of paragraph 15 of the employment agreement." (Italics shown.)

The trial was conducted before the court sitting without a jury and on December 14, 1960, the trial judge filed his "MEMORANDUM DECISION." The "FINDINGS OF FACT AND CONCLUSIONS OF LAW" were filed December 28, 1960, and "JUDGMENT" was entered December 30, 1960 (see fn. 1).

Warner's first contention on its appeal from the judgment is that "The Facts Must Be Related to the Contract Provisions, and When This [is] Done, Essential Findings Relating to the Impact of the Strike Are Not Supported by the Evidence."

The findings relating to the impact of the strike are as follows:

### "XII.

"During the entire period of the writers' strike plaintiff continued the preparation, production and completion of motion pictures.

### "XIII.

"The preparation, production and completion of motion pictures by plaintiff was not prevented, materially hampered or interrupted by reason of the writers' strike.

### "XIV.

"Plaintiff was not unable to obtain material by reason of the writers' strike.

### "XV.

"The production by plaintiff of the 'Maverick' series was not suspended, interrupted or postponed by reason of the writer's [*sic*] strike."

Warner divides its insufficiency of the evidence contention into two subdivisions. Under subdivision (a) Warner contends that Finding XIII indicates that the trial court erroneously construed the *force majeure* clause to require absolute impossibility or a complete cessation of all activity in order to constitute a casualty period.

In this respect, Warner points to the *force majeure*

clause which is in the disjunctive (i.e., "If the preparation, production or completion of motion pictures by Producer . . . shall be prevented or materially hampered or interrupted by reason of . . . strike . . .") and compares it with Finding XIII which is in the conjunctive (i.e., "The preparation, production and completion of motion pictures by plaintiff was not prevented, materially hampered or interrupted by reason of the writers' strike"). (Emphasis added.)

We do not believe that Finding XIII discloses that the trial court construed the *force majeure* clause to require absolute impossibility or a complete cessation of all activity in order to constitute a casualty period. (See *Overseas Metal & Ore Corp.* v. *Rosenfield,* 132 Conn. 364 [44 A.2d 625].)

Findings are to be liberally construed and resolved in favor of upholding rather than defeating the judgment. (*Woodbine* v. *Van Horn,* 29 Cal.2d 95, 109 [173 P.2d 17]; *Del Riccio* v. *Photochart,* 124 Cal.App.2d 301, 313 [268 P.2d 814].) In accordance with this principle, the proper interpretation of Finding XIII (if it requires interpretation at all) is as follows:

The preparation of motion pictures by plaintiff was not prevented, materially hampered or interrupted by reason of the writers' strike; the production of motion pictures by plaintiff was not prevented, materially hampered or interrupted by reason of the writers' strike; and the completion of motion pictures by plaintiff was not prevented, materially hampered or interrupted by reason of the writers' strike.

A large amount of statistical data was introduced to show the effect of the writers' strike on the preparation, production, and completion of theatrical and television motion pictures. The evidence shows and Warner concedes that ". . . there was at all times during the strike, both before and after March 3rd, some activity at the Studio, and some preparation, production or completion of motion pictures were at all times going on in some way and to some extent and with respect to some pictures or series." The evidence supports the finding.

Subdivision (b) of Warner's contention concerning the purported insufficiency of the evidence provides, "The Findings With Respect to the Impact of the Strike on Maverick [i.e., as distinguished from the impact of the strike on Warner's general activity] Are Likewise Unsupported by the Record and Are the Result of the Erroneous Construction of the Contract."

As already pointed out, the provisions of paragraph 15 of the contract are in the disjunctive and contain several alternatives. The first alternative relating to Warner's general activity has heretofore been discussed. Another alternative contained in paragraph 15 is that ". . . if the production of any motion picture or other production to which Artist is assigned hereunder shall be suspended, interrupted or postponed by any such cause, . . . (the continuance of any such event being hereinafter designated as the 'casualty period'), then, during the continuance of such casualty period, Producer shall not be obligated to make any weekly payments to Artist . . .''

The trial judge in his "MEMORANDUM DECISION" made it clear that he construed the above alternative provision of paragraph 15 as not being applicable to Maverick (i.e., any Warner's production). The memorandum provides in pertinent part as follows:

"The court will find that the provision, 'or if the production to which Artist is assigned hereunder shall be suspended, interrupted or postponed by any such cause' means the lending or assignment of the services of Artist pursuant to Paragraph 13 to a producer other than Warner Bros. and does not mean 'assignment' of the Artists to one of Warner Bros. productions.''[6]

---

[6]Paragraph 13 of the contract provides as follows:

"13. *Transfers, Loanouts and Assignments*: Any and all rights or privileges granted to Producer hereunder shall inure not only to its benefit but also to the benefit of all persons who may hereafter lawfully acquire any right to distribute, sell, transmit, exhibit, advertise and/or exploit motion pictures produced hereunder or trailers or clips thereof, or any other products or productions in connection with which Artist renders services hereunder; it being expressly agreed that the same may be released, sold and/or distributed under any company or trade name, brand, producing mark, trade-mark or characteristic desired by Producer.

"Producer specifically reserves and retains, and Artist specifically agrees that Producer shall have, the right to sell, transfer, assign, license or otherwise dispose of said motion pictures, products or productions, and all or any part of its rights with respect thereto, and the advertising and exploitation thereof, and all or any part of its rights in and to the results and proceeds of Artist's services hereunder to any person.

"Producer shall also have the right to sell, assign, or otherwise dispose of (herein called 'assign') its rights to require Artist to render services hereunder and to lend, rent or transfer (herein called 'lend') the services of Artist hereunder to any person, except that Producer will not assign this agreement in its entirety to any person except a major producer of motion pictures, as this term is generally understood in the motion picture industry at the time involved, or a person with which Producer may merge or which may acquire all or substantially all of Producer's

Initially it must be noted that there was no finding made concerning whether Garner was "assigned" to a production by Warner. The court did find (Finding XV) that "The production by plaintiff of the 'Maverick' series was *not* suspended, interrupted or postponed by reason of the writer's [*sic*] strike." (Emphasis added.)

Although Warner has presented extensive argument in its brief attempting to show that the trial court erroneously construed the alternative contained in the *force majeure* clause concerning the ". . . production to which Artist is assigned hereunder . . ." it is manifest that the trial court's construction is immaterial if there is substantial evidence to support Finding XV. Counsel for Warner concedes this fact.[7]

An examination of the record discloses that there is substantial evidence to support the trial court's determination (Finding XV) that "The production by plaintiff of the 'Maverick' series was not suspended, interrupted or postponed by reason of the writer's [*sic*] strike."

As of March 2, 1960, Warner had completed production on the Maverick series for 1959-1960 and had filmed one "extra" episode which was not scheduled to be telecast until September 25, 1960. In the past, Warner had not started production until May or June or later, with respect to the next air date season, and producer Trapnell testified that when he took over

---

assets used in the production of motion pictures, or a parent, subsidiary or affiliated corporation of Producer's.

"If Producer assigns or lends Artist's services, as aforesaid, Artist shall render such services as may be required under the terms hereof to the assignee or borrower. No act or omission by a borrower or assignee shall be considered a breach by Producer under this agreement, but in the event of any such act or omission by a borrower which would have been a breach if committed by Producer, Artist shall not be obligated to render further services to such borrower. In the event Producer lends the services of Artist, Producer shall, nevertheless, pay Artist all moneys due Artist as herein provided; and shall retain its rights hereunder; and such borrower shall be entitled to such rights in and to the motion picture or other production involved, and such incidental rights in connection with the advertising and exploitation thereof as Producer would be entitled to hereunder and agrees to grant to such borrower.

"Producer may make such arrangements with any assignee or borrower for compensation for lending or assigning the services of Artist as Producer may determine, and Producer shall be entitled to retain all moneys and other consideration received from any such borrower or assignee." (Italics shown.)

[7]During oral argument counsel for Warner conceded that if there was substantial evidence to support Finding XV then the trial court's construction of this particular part of the *force majeure* clause becomes immaterial.

as Maverick producer on June 15, 1959, there was not a single completed script for the 1959-1960 season, yet Warner met its September 12 air date. Warner's executives knew that production on the Maverick series for the 1960-1961 season would ordinarily not begin until May, at the earliest, and that May production would, as the trial court found (Finding XVII), allow the maximum time necessary to meet the 1960-1961 air date commitments.[8] The facts must be related to the manner by which Warner conducted its business.

On March 3, 1960, Warner had approximately 14 "Hermanos" writers available in its television department; at least one of the 14 had done work on a Maverick script previously. Warner had at least two stories suitable for development into Maverick scripts and, judging by both past and subsequent events, it could write a Maverick script in 15 days, or possibly rewrite an old script in as little as five days. Furthermore, the head of the television department indicated on direct examination that Warner ". . . may have had other [Maverick and Cheyenne] scripts in at this point but I don't think so."

We believe that the evidence, taken as a whole, shows that Warner was able to obtain scripts when Warner wanted them and that production of Maverick was not suspended, interrupted or postponed by reason of the writers' strike.

■■■ Warner's next contention is that "The Findings of the Court That the Action of Warner Was Not in Good Faith Cannot Be Supported."

The trial court found (Finding XX) that "The refusal of plaintiff to pay defendant compensation after demand by defendant was willful, deliberate and not in good faith."

At the conclusion of the arguments by counsel the Reporter's Transcript discloses that the trial judge made the following statement:

"THE COURT: Well, I am satisfied from the evidence that Warner Bros. did not have justification for laying Mr. Garner off on March 2nd. I think that is indicated by the testimony

---

[8]Finding XVII provides that "As of March 3, 1960 defendant had completed the rendition of his services for the last episode of the 'Maverick' series to be broadcast during the 1959-60 broadcast year and had also rendered his services in the first episode of the 'Maverick' series to be broadcast during the 1960-61 broadcast year. Plaintiff would have been able to commence preparation and production of 'Maverick' episodes for the 1960-61 broadcast year on or about May 1, 1960."

even of the plaintiff's witnesses and particularly Mr. Warner."[9]

The trial judge in his "MEMORANDUM DECISION" stated in pertinent part as follows:

"The breach in this case was wilful.

---

[9]The testimony of Mr. Warner on cross-examination is in pertinent part as follows:

"Q. I would like to call your attention to the meeting of March 2nd in your office in the afternoon. Now, that meeting took place approximately six weeks after the writers' strike had begun on January 16th.

". . . . . . . . . . . . . .

"A. . . . I agree with you.

"Q. Now, you testified that you made a decision to exercise force majeure against Mr. Garner, Mr. Kelly and Mr. Walker on or about March 2, 1960.

". . . . . . . . . . . . . .

"A. Yes, I made the decision, yes.

"Q. And you made the decision after hearing the report from Mr. Orr at this meeting of March 2nd?

"A. Not exactly after that meeting. It could have been many, many days or a few meetings after, as I say.

"Q. Let me keep you straight. We have documents showing that the suspension notices on force majeure went out on March 2, 1960. We have the testimony that the meeting in your office took place in the afternoon of March 2, 1960.

". . . . . . . . . . . . . .

"Q. Have you any recollection as to anything other than Mr. Orr's report upon which you based your decision to suspend Mr. Garner, Mr. Kelly and Mr. Walker?

". . . . . . . . . . . . . .

"A. . . . No, I haven't any. I can't remember how we came to pass on it at that meeting other than it was the right thing to do and the right time came; naturally, we would do it.

". . . . . . . . . . . . . .

"Q. Now, did Mr. Orr give you any report with reference to the number of writers he had working for him immediately preceding that meeting, that is to say, the end of February, 1960? A. At no time has Mr. Orr ever given me a report of whom he has working for him, in writing or any of the departments of any consequence.

"Q. Did he in that report tell you that at the end of February, 1960, despite the writers' strike his division had succeeded in securing the services of 14 writers for television episodes? A. No, I don't remember him telling me anything pertaining to amounts, no.

". . . . . . . . . . . . . .

"Q. Do you know as a fact that the Television Division did meet its commitments and did produce television pictures for the 1959-1960 season?

". . . . . . . . . . . . . .

"A. I imagine they did because I didn't hear anyone complaining.

". . . . . . . . . . . . . .

"Q. Now, as of March 2nd, do you remember Mr. Orr telling you how many scripts they had ready to shoot on March 2, 1960, for television?

"A. No, I don't remember him telling me at any time, no, whether he did or he didn't. I can't remember it.

". . . . . . . . . . . . . .

"Q. I am particularly interested in March 2nd and Mr. Orr's report.

"The court will find that plaintiff was not justified in stopping the payment of defendant's salary, under the provisions of paragraph 15 of the contract, for the reason that the preponderance of the evidence does not establish that a 'casualty

---

Did he tell you on that occasion or did Mr. Benson or did anybody tell you that as of that date, March 2nd, they had available two ideas which could be made into scripts for 'Maverick'? And the two scripts subsequently made in May of 1960 were entitled 'A State of Siege' and 'Arizona Black Maria.'

"A. I don't remember them discussing any —— not only the 'Maverick' series or any series or any source because I just humanly do not have time to read these, so many scripts. We have 200 shows.

"Q. The purpose of my question is this. I want to make it clear: When you exercised your right and power as president and instructed your subordinates to suspend Messrs. Garner, Kelly and Walker by reason of their force majeure clause in their contracts, you did not know that there were available two stories for the 'Maverick' series on March 2, 1960, which could have been made into scripts for 'Maverick' episodes?

"A. No, I did not know other than — I repeat again — that there was a general concentration of trying to get scripts for all the shows which naturally took in 'Maverick' and everyone of them, so if they had anything to do I can't say that I knew about it.

"Q. Did you ask Mr. Orr whether there was any material available that could be made into a 'Maverick' script before you decided to suspend Mr. Garner? A. No, I didn't, . . .

". . . . . . . . . .

"Q. At this meeting when you decided to exercise force majeure did you discuss with Mr. Orr or Mr. Trilling the possibility of using Mr. Garner as an actor in other TV series which were continuing production? A. No, I did not discuss that.

"Q. Did you give it any thought before you decided to suspend Mr. Garner? A. Other than the final report from Mr. Orr that we did not have any scripts to be made on March 2nd, that therefore we decided to suspend him, yes, sir.

"Q. Did you discuss with Mr. Orr putting any available writers to work writing scripts for 'Maverick' before you decided to lay Mr. Garner off? A. No, I did not.

"Q. Did you give it any consideration? A. Only what Mr. Orr and I discussed personally.

"Q. Which you have related. A. I don't remember everything that we said.

". . . . . . . . . . .

"Q. At this meeting when you decided to suspend Mr. Garner for a period beginning March 3, 1960, did you have in mind the fact that Garner was going to render services as an actor in television during March and April of 1960? A. You mean for Bob Hope?

"Q. Yes. A. Yes.

"Q. You knew that Warner Bros. was going to be paid $5,000 for those services? A. No, we were going to get $10,000, of which $5,000 was going to be refunded to him — we don't want to get everything. Don't make the employer the villain.

"Q. I will stipulate that you had a right to keep all of it if you wanted to. You could have kept all of it. All I am asking you is whether when you decided to suspend Mr. Garner on March 2, 1960, you had in mind the fact that Mr. Garner was going to work during March and

period' in fact existed; and for the further reason that the refusal to pay Garner's salary was in bad faith as evidenced, in part, by the manner in which the Bob Hope Show transaction was handled. Plaintiff's act in refusing to pay defendant's

---

April as an actor in television and that Warner Bros. was to benefit therefrom to the extent of $5,000?

"A. Undoubtedly I did but, however, I took for granted Mr. Orr and our attorneys would give Mr. Garner the legal right to so do irrespective of the suspension. I imagine that is the routine that went on.

"Q. Assuming that you had that in mind, did you ask your executives with whom you talked about the possibility of getting another role for Mr. Garner instead of laying him off? A. Before the layoff?

"Q. Yes. A. I am not in that end of it so therefore I didn't talk about it. I am not a booking agent, I don't think.

"Q. You knew when you authorized the signing of the letter of suspension that Mr. Garner would not receive a weekly salary during that period?

" . . . . . . . . . . . . .

"A. Well, I certainly should know it.

" . . . . . . . . . . . . .

"Q. By Mr. Gang: Did you give any consideration whether you on March 2, 1960, when you instructed your executives to suspend payment of compensation to Mr. Garner of the fact that he could be employed and render services as an actor in television during the period of time that you didn't want to pay him?

"A. I don't know — you leave me a little dull, and our contract gives us the right that you are talking about there. Naturally, we suspended him. About trying to get him employment, I have nothing to do with that so I can't answer you.

"Q. None of your executives proposed that subject to you?

"A. Not until some time later when we got the letter that we had come from you or Mr. Garner, that we would get him work elsewhere, along the lines you related.

"Q. After we complained? A. Yes, and we also wrote if he would live up to his agreement, we believed we would make every effort to get work for him. Of course, we got the negative answer. In his mind this contract was out, which it is not.

" . . . . . . . . . . . . .

"Q. My question is: You didn't refuse to pay Mr. Garner's salary when he demanded it after you suspended him because you didn't have the money?

" . . . . . . . . . . . . .

"A. It is the only thing we had, was money to try to keep it going.

" . . . . . . . . . . . . .

"Q. By Mr. Gang: Mr. Warner, these last three exhibits were all based upon a press release issued by your studio, were they not?

"A. Yes, they were.

"Q. And you saw that press release before it was issued?

"A. I virtually wrote it. It was an optimistic —— can I continue why I wrote it, or is it unnecessary?

"Q. Maybe Mr. Williams will ask you that. Particularly I call your attention to the language which appears in the Daily Variety issue, which is Exhibit J, on page 7, reading, in quotation marks, quoting you, Mr. Warner:

" 'Warner Bros. looks forward with extreme enthusiasm and confidence to the months and years ahead. Production activities at Warner Bros.

salary justified Garner in treating the refusal as a total breach of the contract.

"When the dispute arose as to the rights of Warner Bros. to suspend Garner's salary, it could have protected itself by paying the salary and recouping the amount paid—if the suspension was justified—under the provisions of the second paragraph of numbered paragraph 17 of the contract."[10]

A reasonable inference can be drawn from all of the evidence that Warner knew that it would not be in any trouble with respect to Maverick unless it could not start preparing another episode by May 1, 1960 (at the very earliest, since one 1960-1961 episode was already completed). Warner did in fact start preparation on two episodes in late April and by June 15 (at least three months prior to the first air date and still before the end of the writers' strike) had completed "preparation" and "production" on four "Maverick" episodes, was filming a fifth, and had four scripts in preparation.

 Finally, Warner asserts as its last contention that "If

---

have continued at a high level due to filming for television. Now, major picture production also is being accelerated.'

"... . . . . . . . . . .

"Q. As a matter of fact, the statement was true, was it not? A. You mean the whole statement?

"Q. Yes. A. No, not exactly.

"Q. Look at your deposition, page 40. A. Much of it is true and much of it is what we call good propaganda.

"Q. Page 44 of your deposition, and I am referring to the statement we have just been discussing, line 12:

"'Q. Will you look up the statement, and if it is any different will you put the statement in the record as an exhibit?'

"And

"'Q. Did you keep on functioning during that period of time?'

"And your answer, line 17:

"'A. I think I have said that many, many times. Certainly we kept on functioning. Whatever scripts they could put together, or scripts that they had, which I don't know what they are. Certainly we kept on shooting.'

"You did so testify?

"A. Yes, that's exactly as I say. I say that again."

[10]Paragraph 17 of the employment contract provides in pertinent part as follows:

"If Producer shall have made weekly payments to Artist during any period when it was not obligated to do so, under any provision of paragraphs 14, 15, or 16, such fact shall not affect Producer's right to extend the current term as aforesaid; and whether or not Producer shall exercise said right of extension, Producer shall, nevertheless, not be obligated to make weekly payments to Artist for an equivalent period, and may withhold from any other moneys payable to Artist hereunder, such amount as Producer was not obligated to pay Artist by reason of the provisions of said paragraphs 14, 15, and 16."

Warner Erroneously Interpreted the Contract, Its Action Did Not Constitute a Serious and Total Breach Justifying a Termination by Garner.''

Warner's contention cannot be sustained. When Warner informed Garner that it elected not to pay Garner the stipulated weekly salary, Warner's act constituted a refusal, without cause, to pay an employee his compensation. The employee's right to *terminate* the contract where there has been a wrongful refusal to pay compensation is established by both the statutory and case law of this jurisdiction.

Labor Code section 2925 provides that ''An employment for a specified term may be terminated by the employee at any time in case of any *wilful* or permanent breach of the obligation of his employer to him as an employee.'' (Emphasis added.) As set forth above, the trial judge in his ''MEMORANDUM DECISION'' stated that the ''breach in this case was wilful.''

In *May* v. *New York M. Picture Corp.*, 45 Cal.App. 396 [187 P. 785], the court defined ''wilful'' in connection with what is now Labor Code section 2924, and stated at page 404, in part as follows:

''In civil cases, the word 'willful,' as ordinarily used in courts of law, does not necessarily imply anything blamable, or any malice or wrong toward the other party, or perverseness or moral delinquency, but merely that the thing done or omitted to be done was done or omitted intentionally. It amounts to nothing more than this: That the person knows what he is doing, intends to do what he is doing, and is a free agent. (*Benkert* v. *Benkert,* 32 Cal. 470; *Towle* v. *Mathews,* 130 Cal. 577 [62 P. 1064]; 40 Cyc. 944.)''

With reference to the case law on the subject, see *Percival* v. *National Drama Corp.*, 181 Cal. 631, 637-638 [185 P. 972]; *Cummings* v. *Universal Pictures Co.*, 62 F.Supp. 611 [S.D. Cal. 1944], affd. 150 F.2d 986 (9 Cir. 1945).

Having disposed of Warner's contentions raised on its appeal from the judgment, we now turn to Garner's contentions on his limited appeal from the judgment.

 As indicated in footnote 5, Garner, on April 26, 1960, filed an ''AMENDED CROSS-COMPLAINT (Damages for breach of contract; Injunction).'' As set forth above Garner was awarded the sum of $1,750 plus interest, and Garner's appeal is from that award.

The basis for the trial court's determination that Garner

was entitled to judgment in the sum of $1,750 is succinctly set forth in his "MEMORANDUM DECISION" as follows:

"This brings us to the question of Garner's right to recover damages.

"*It must be remembered that Garner was not discharged.* (Emphasis added.)

"As was said in *Percival* v. *National Drama Corp.*, 181 Cal. 631 [185 P. 972], p. 638: 'The evidence does not show that the defendant refused to permit the plaintiff to render any services. The most that can be said of it is that defendant did not require any services of plaintiff. This fact, unless accompanied by some affirmative act indicating a discharge, is not sufficient proof thereof.'

"When Warner Bros. notified Garner his salary would be suspended *he* [italics shown] treated it as a breach of the contract. Warner Bros. was still anxious for him to render services under the contract.

"The law is that if an employee is discharged his remedy is an action for damages. Where he has not been discharged but merely has been prevented by the employer from working, he need not treat the contract as broken but may sue on the contract and recover the agreed compensation. But in order to recover the agreed compensation he must be ready, able and willing to perform.

"In this case, after declaring a breach of the contract, Garner refused to recognize it and refused to render services to or for Warner Bros.

"Therefore, while Garner had the right to terminate the contract, he does not have the right to recover damages. The right he had was the option to quit his employment and sue for the salary then due, or of continuing in the employ of Warner Bros., and sue for his salary as it accrued. See 32 Cal.Jur.2d, pp. 479-497.

"*Stone* v. *Bancroft*, 112 Cal. 652 [44 P. 1069]

"*Stone* v. *Bancroft*, 139 Cal. 78 [70 P. 1017, 72 P. 717]

"*Percival* v. *National Drama Corp.* (*supra*)

"*Garner terminated the contract about one week after the commencement of the term, and he is entitled to be paid for that period.* (Emphasis added.)

"In accordance with the foregoing the court will find and conclude: that the conditions that would have warranted Warner Bros. to suspend Garner's salary did not exist; that Garner was justified in terminating the contract; that Garner does not have the right to recover damages for breach of con-

tract because he terminated the contract and was unwilling to perform further; that Garner has the right to recover one week's salary, i.e., $1,750.00, and his costs of suit.''

The trial court found from substantial evidence in pertinent part, as follows:

## "VII.

"On March 2, 1960, plaintiff mailed defendant a written notice that plaintiff elected, as of March 3, 1960, not to make weekly payments to defendant under the contract.

## "VIII.

"On March 8, 1960, defendant served a written notice on plaintiff denying the right of plaintiff to refuse to pay defendant the weekly compensation provided for in the contract and demanding that plaintiff pay to defendant the amounts due him under said contract.

## "IX.

"Plaintiff, after such demand, willfully refused to pay defendant the compensation due him under the contract.

## "X.

"On or about March 10, 1960, defendant informed plaintiff in writing that defendant had elected to treat plaintiff's action in refusing to pay compensation to defendant as a total breach of the contract and that defendant considered himself free of any obligations to plaintiff.''

The ''CONCLUSIONS OF LAW'' were in part as follows:

## "I.

"The refusal of plaintiff to pay defendant compensation under the contract after demand by defendant was a [*sic*] material and defendant had the right to treat it as a total breach of the contract.

## "II.

"Defendant is free of any obligation to plaintiff under the contract.

## "III.

"*The refusal of plaintiff to pay defendant compensation was not a discharge of defendant by plaintiff, and, accordingly, defendant is not entitled to recover damages for breach of contract for the period of time after March 10, 1960, on which date defendant rightfully elected to treat the refusal of plaintiff to pay defendant as ground for terminating the*

*contract and for defendant abandoning his employment by plaintiff.* Defendant is entitled to damages in the sum of $1,750.00 for the period between March 3, 1960 and March 10, 1960.'' (Emphasis added.)

In the light of the evidence, the findings of fact based thereon and the conclusions of law which flow from the findings, it is clear that the trial court correctly determined the amount of damages to which Garner was entitled, unless this court holds as a matter of law that Warner's suspension of Garner's salary payments constituted a ''wrongful discharge.''

█ It is stated in *Percival* v. *National Drama Corp.*, 181 Cal. 631, 637-638 [185 P. 972]:

''A discharge cannot be effected by a secret, undisclosed intention on the part of the master. It must be done by some word or act communicated to the servant. █ 'No set form of words is necessary; but any words or acts which show a clear intention on the part of the master to dispense with the servant's services, and which are equivalent to a declaration to the servant that his services will be no longer accepted, are sufficient.' (26 Cyc. 987.) . . . █ *[T]he authorities declare that mere failure of the master to pay wages to the servant does not amount to a discharge.* [Citations.] █ *Such failure or refusal to pay merely gives the servant the option of quitting his employment and the right to sue for the salary then due and unpaid, or of continuing in the service, with the corresponding right to require and enforce payment of the salary as it accrues.* [Emphasis added.]

''Even when the refusal to pay is accompanied by a refusal to permit the servant to perform the duties it has been held that no discharge was shown. *(Stone* v. *Bancroft,* 139 Cal. 83 [70 P. 1017, 72 P. 717]; *Stone* v. *Bancroft,* 112 Cal. 657 [44 P. 1069]; *Winsor* v. *Silica Brick Co.,* 31 Cal.App. 89 [159 P. 877].)''

The *Percival* case has been cited in later cases as authority to the effect that: (1) nonpayment of compensation in itself is not a discharge *(Palmer* v. *Harlow,* 52 Cal.App. 758, 762 [199 P. 844]); (2) no set words or language are necessary to constitute a discharge provided the circumstances show a disclosure of an unequivocal intention on the part of the employer to dispense completely with the services of the employee *(Stroman* v. *Atchison, T. & S.F. Ry. Co.,* 161 Cal.App.2d 151, 161 [326 P.2d 155]; *Canavan* v. *College of Osteopathic P. & S.,* 73 Cal.App.2d 511, 521 [166 P.2d 878]; *N.L.R.B.* v.

354

*Cement Masons Local* (9 Cir. 1955) 225 F.2d 168, 172; *Taylor* v. *Tulsa Tribune Co.* (10 Cir. 1943) 136 F.2d 981, 983; and (3) one of the factors entering into determining such intent would be whether the employer has gone out of business (*Gaspar* v. *United Milk Producers,* 62 Cal.App.2d 546, 551-552 [144 P.2d 867]).

We are not prepared to hold as a matter of law that the suspension by Warner constituted a discharge. Without belaboring the point we believe that the trial court, upon the evidence presented, was correct in its determination.

For the reasons stated, the judgment, and the whole thereof, is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied December 20, 1961, and the petition of the plaintiff and appellant for a hearing by the Supreme Court was denied January 24, 1962.