**Raymond DAY, Plaintiff-Appellant,**

v.

**UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, LOCAL 36 OF UAW, and Ford Motor Company, Defendants-Appellees.**

No. 71–1547.

United States Court of Appeals, Sixth Circuit.

July 27, 1972.

Rehearing Denied Oct. 3, 1972.

James D. Jackson, Detroit, Mich., for appellant.

Edwin Fabre, Stanley Lubin, Detroit, Mich., Joseph A. O'Reilly, James R. Jackson, Dearborn, Mich., Bruce A. Miller, Zwerdling, Miller, Klimist & Maurer, Detroit, Mich., for appellees.

Before PHILLIPS, Chief Judge, PECK, Circuit Judge, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

Plaintiff brought action against the Ford Motor Company, a Delaware corporation, for reinstatement as an employee, and for damages suffered by him as a result of Ford's wrongful discharge

of him. He also brought action against appellee Union, of which he was a member, for breach of the duty owed to him of fair representation in the manner in which his grievance, regarding the discharge, was handled. Appellee Ford Motor Company and the Union filed motions for a summary judgment before hearing of the evidence, and the District Court granted such motions.

■ In granting appellees' motions for a summary judgment, the District Court accepted, as true, the allegations in appellant's complaint. The rule governing this case was stated in an earlier adjudication to the effect that where a defendant moved for a summary judgment, the court must accept allegations of complaint as true. Furton v. City of Menasha, 149 F.2d 945 (C.A.7). "On a motion for summary judgment made by defendants the facts alleged in the petition must be taken as true, unless by the admissions, depositions, and other evidence introduced, it appears beyond genuine controversy otherwise." McCombs v. West, 155 F.2d 601, 602 (C.A.5). In somewhat different language, the rule was stated: "On a motion for summary judgment, the pleadings of the opposing party must be taken as true, unless by the admissions, depositions or other material introduced it appears beyond controversy otherwise." Hiern v. St. Paul-Mercury Indemnity Company, 262 F.2d 526, 528 (C.A.5); and the court takes as true all well-pleaded facts contained in the complaint as well as the admissions on file, giving to the plaintiff the benefit of all reasonable inferences to be drawn therefrom. Pittsburgh Hotels Ass'n, Inc. v. Urban Redevelop. Auth., 202 F.Supp. 486 (W.D.Pa.). Facts alleged in a proposed supplemental complaint were required to be taken as true, where defendant filed a motion for summary judgment. McHenry v. Ford Motor Co., 269 F.2d 18 (C.A.6). The rule is sometimes stated: "On a motion for summary judgment, all facts of the complaint well pleaded stand admitted. On a consideration of such a motion, the court not only considers the allegations of the complaint but also all facts shown by depositions and affidavits concerning which there can be no dispute." Harris v. Railway Express Agency, 178 F.2d 8 (C.A.10). In Donahue v. Warner Bros. Pictures, 194 F.2d 6 (C.A.10), the court, in holding that a motion for summary judgment admits all matters well pleaded, stated: "While by answer many of the material allegations contained in the amended complaint were denied the motion for summary judgment admitted all matters well pleaded in such complaint. That was the posture of the case at the time the summary judgment was entered." A summary judgment movant admitted all facts that had been well pleaded by the plaintiff. Gore v. Northeast Airlines, Inc., 373 F.2d 717 (C.A.2).

The action of the District Court was in keeping with Rule 56(c) of the Federal Rules of Civil Procedure relating to summary judgments, which provides that such a judgment may be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.

In this case there were no depositions, answers to interrogatories, or admissions of the plaintiff on file. The judgment was entered on the pleadings and on defendant's motion for summary judgment.

On appeal in this case, we accept as true appellant's allegations in his complaint, as did the District Court; and the statement of facts, which follows, is taken from the allegations of appellant's complaint and other admitted facts.

Appellant entered into an employment contract with the Ford Motor Company on March 30, 1965. After having successfully completed a 90-day period of probationary employment, he became a regular employee of the Company. He also became a member in good standing of appellee Union which was the bargaining agent of the employees at the plant where appellant was employed. He continued working at the Ford Motor Com-

pany for approximately three and a half years, until he was given a sick leave on August 12, 1968, to December 13, 1968. He had three and a half years' seniority at the time of his leave. When appellant was given the sick leave, he was earning $3.75 an hour as a paint sprayer. On the last day of appellant's sick leave, December 13, 1968, he was arrested and detained by police on a charge of murder.

The charge of murder arose out of the following circumstance: A Union official, of the same Local, had called appellant by telephone and told him he was on his way over to his home to kill him. Shortly after this telephone call, appellant killed the Union official in defense of himself and his family. For clarity at this point, it should here be mentioned that appellant was subsequently found not guilty of the charge of murder or of manslaughter.

When appellant was arrested on the murder charge, his wife immediately notified the Ford Motor Company of his involuntary absence, his detention, and of his intent to return to work. Appellant was released on bond on January 11, 1969, and at once went to the Ford plant accompanied by his wife and by his Union bargaining plant committeeman, Mr. L. L. Daniel, and spoke with Mr. Dick Echols, the labor relations representative of the Ford Motor Company. Mr. Echols required appellant to undergo a physical examination, and afterward told him that he would be reinstated if he was found to be not guilty of the murder charge.

Five days later, on January 16, 1969, during the period appellant was waiting for exoneration by the court of the charge of murder, a "disciplinary discharge" was signed by Mr. Echols and appellant's record was marked as "discharged." It is this discharge that the Company and the Union rely upon, although they assert the discharge was for appellant's "unsatisfactory attendance" while he was awaiting trial of the criminal case.

Counsel for appellant, throughout his argument and brief, emphasized that appellant had never received notice of the disciplinary discharge.

In reply to this contention, counsel for the Ford Motor Company states in his brief on appeal that "[appellant's] brief, as well as oral * * * argument below, also goes beyond the allegations in the Amended Complaint in claiming that the employee was discharged in absentia on January 16, 1969, with notice being given only to the Union." It is true that that particular allegation was not made .in appellant's Amended Complaint. Counsel for the Company, arguing before the District Court, in saying that the allegation that appellant was discharged without notice could easily be disproven was, at this point, interrupted by the District Judge, who asked:

"By that you mean that there was notice sent?

"[Counsel for the Ford Company]: Yes. In fact the union representative signed the disciplinary action form, discharging [appellant] on January 16, 1969."

Obviously, counsel for the Ford Motor Company was arguing that notice was sent, because the Union representative signed the disciplinary discharge. And counsel went on to state that even if the allegation had been made that appellant was discharged in absentia without notice, that would not be a violation of the collective bargaining agreement, since the collective bargaining agreement states that, in the event of *disciplinary* action against an absent employee, *notice of the action need only to be given to the Union.* In no place does counsel state that any notice of the discharge was given to appellant. It seems grossly unfair and unjust that a Union employee, in good standing with the Union, and not guilty of any deficiency or misconduct toward the Company, could be summarily discharged from his employment and have all his seniority rights, pension

rights, insurance and fringe benefits abolished, without notice to him.

■ Counsel for appellant in his argument before the District Court, and in his argument and brief before us, submits that, due to the various problems of the scattered units of a large company, "Local Agreements" and "Letters of Understanding" are needed to cope with problems and unique situations found in the local Unit; that the "Letters of Understanding" were negotiated by the Local of the Union to which appellant belonged, and are supplemental to, and in addition to the Main Agreement reached by the U.A.W. International and the Ford Motor Company; that such letters are designated the "Wixom Letters of Understanding" named after the Wixom plant of the Ford Company where appellant was employed; that the "Wixom Letters of Understanding" provide *for a hearing with a Union representative* present. Ford does not deny this, but submits that the "Wixom Letters of Understanding" were not made part of the record in this case; were not mentioned in the allegation of appellant; and hence cannot be considered. That is true. We cannot consider arguments based on such "Letters;" but, on a retrial, appellant may amend his allegations including the provisions of the "Wixom Letters of Understanding" that provide for a hearing in case of discharge.

Relying solely on Mr. Echols' statement that reinstatement would be made when he was exonerated, appellant continued to wait for exoneration by the court—which was granted on February 5, 1970.

Almost immediately appellant returned to the employment office of the Ford Motor Company and asked that he be reinstated in his job. He was then denied reemployment on the ground that he had been discharged. He then got in touch with Mr. L. L. Daniel, the Union bargaining agent who had accompanied him to Mr. Echols' office more than a year before on the occasion when Mr. Echols told appellant he would be reinstated upon exoneration of the murder charge.

Appellant had Mr. Daniel, who was still his Union bargaining committeeman, file a grievance on February 9, 1970, claiming the discharge to be an "unjust penalty." As the bargaining committeeman, Mr. Daniel signed the grievance form, setting forth that appellant could not report for work between December 13, 1968, the last day of his sick leave, and January 16, 1969, the day of his release on bond, for the reason that he had been detained by the police on a charge of murder; that appellant had been told by the Ford Company he would be reinstated in employment if he were found not guilty of the murder charge; that, when appellant reported for work on February 9, 1970, a few days after he had been found not guilty, he was told, on that date, by Ford's labor relations representative, that he had been discharged, and that there was no more work for him. Mr. Daniel further set forth in the grievance that appellant had acted in defense of his life and protection of his family, and stated that because the man who was killed was also an employee of the Ford Motor Company, the Company felt that the discharge of appellant was "the best for all concerned." The grievance concluded: "There was no 5 day notice sent."

Mr. Daniel, who, on February 9, 1970, filed the grievance stating that appellant had not received the five-day notice before discharge, actually, as bargaining committeeman, had notice of the discharge of appellant a year before, on January 16, 1969, since he had signed his name to the discharge as the committeeman receiving notification thereof, but he did not tell appellant he had been discharged, although he knew appellant relied upon him, and he could get in touch with appellant almost instantly. Appellant left the matter of the grievance in the hands of Mr. Daniel, who had filed it and signed it for him.

■ On March 6, 1970, the grievance was denied as "untimely" by Mr. Echols, the same labor relations representative

of Ford who had told him he would be reinstated as soon as he was exonerated of the murder charge. When appellant called him several months later, Mr. Daniel reported that he "was finished" and "that he had gone as far as he could." The grievance that appellant had Mr. Daniel file for him was a "second stage" grievance, and the Union contract with Ford provides that only the Union representative may proceed beyond a "second stage" grievance.

The Ford Motor Company, in its brief in this Court, declares: "The plaintiff's grievance was considered by the Company and denied as untimely on March 3, 1970. *The Union representative did not choose to appeal that disposition.*" It now turns that this was not the case at all. The Union representative had no choice whatever to appeal that disposition. A wholly inexplicable circumstance now appears—not revealed until after argument before this Court, when, dubious about certain notations that appeared on the grievance filed, the Court caused the Clerk to inquire from the parties as to the meaning of the notations. In reply to this inquiry, the Court learned that Mr. Echols signed his name to the denial of the grievance as "untimely." There appeared on the grievance also the written letters, "DDC," and the word, "Withdrawn." The Court, in answer to its inquiry, was informed by counsel that the letters, "DDC," are the initials of the three Union plant committeemen; that they were in agreement with the denial of appellant's grievance; and that the three Union committeemen thereupon withdrew appellant's grievance from further consideration without any notification to appellant. There is no dispute as to these facts. Such withdrawal of a grievance is posited upon Article VII, Section 3(d), of the Agreements between the Company and the Union, which states: "The Unit Committee shall have power to withdraw a Second Stage Grievance * * *." Up until the three Union committeemen withdrew appellant's grievance, appellant's Union bargaining plant committeeman,

Mr. Daniel, considered the discharge unjust, and that appellant was entitled to reinstatement with back pay, because of the Company's statement that it would reinstate him when he was exonerated of the murder charge. We are not told by the record whether the three Union committeemen, who were members of appellant's own Local and who withdrew appellant's discharge, ever had a meeting; or whether they even considered the grounds for reinstatement set forth by Mr. Daniel in the grievance filed by him, or knew what those grounds were. Whatever the power of such committeemen to withdraw an employee's grievance, they are bound to act, in such regard, justly and equitably toward appellant. Since it was not discovered until after argument of the case in this Court that the three Union committeemen had withdrawn appellant's grievance after denial, without notifying him, appellant thought and claimed Mr. Daniel was blameworthy in not appealing the denial of the grievance. Mr. Daniel, as stated, never told appellant that the three Union committeemen had withdrawn his grievance. His only reply to appellant's inquiry as to how the grievance was proceeding, was that everything was done that could be done and that he was "finished."

From the terms of the bargaining agreement, it is plain to see that there are two types of discharge permitted to the Company. One is a disciplinary discharge, Article IV, Section 3; the other is a discharge for failing to report after an employee has been absent from work without satisfactory excuse, Article VIII, Section 3, Appendix B, of the Collective Bargaining Agreement.

In a disciplinary discharge for unauthorized absence, an employee must proceed through the grievance procedure. Under this procedure, the Unit Committee of the Union has the power to withdraw a second-stage grievance. The grievance filed by Mr. Daniel on behalf

of appellant was a second-stage grievance. Article VII, Section 5, provides:

"Disciplinary Cases

(a) Notice of Action Taken.

When an employe is given a disciplinary discharge, or lay off, or a reprimand and warning, which is affixed to his personnel record, his District Committeeman, if available, or if not, one of his Unit Committeemen, will be promptly notified in writing of the action taken. *When disciplinary action is taken against an employe who is absent, the Unit Committee will be notified.*" (Emphasis supplied.)

■ Appellant was given a disciplinary discharge of "Unauthorized Absence." A disciplinary discharge is a discharge to chastise, discipline or punish; to improve by penal methods, by chastisement or punishment. A penalty is penal retribution. See Webster's New International Dictionary. The disciplinary discharge in this case gave as the reason, "unauthorized absence." It also stated that the "Penalty" was "discharge." It is to be emphasized that absence of an employee without authorization is not, in itself, a basis for a disciplinary discharge.

A "disciplinary" discharge is to be understood, in the light of the definition above mentioned, and in common parlance, as a discharge because of something blameworthy, because of some fault, some deficiency, some lack, some inadequacy, some disobedience, some misconduct, some failure of conduct or performance on the part of the employee discharged. A disciplinary discharge for unauthorized absence on the part of an employee would result from irregular attendance on work days, or absence for a period of work days, or from any dereliction, because of unauthorized absence, from performance of duties. Wherever the term "disciplinary discharge" is used, whether based on conduct or absence, it implies fault, or dereliction of duty. Where an employee is not at fault or derelict in duty, he may not be disciplined.

■ Legitimate absences of an employee, which are not subject to discharge, are provided for in the bargaining contract:

"ARTICLE X

"Section 7. Reporting Absences

"A system shall be established which will permit an employe to verify the fact that he has notified the Company by telephone of his inability to report for work."

Such an absence for inability to report for work could not be the basis of a *disciplinary* discharge.

It is further provided in the collective bargaining agreement in:

"ARTICLE VIII

"Section 5. Loss of Seniority

"Seniority shall be broken for the following reasons:

\* \* \*

"3. (Failure to Report)

"If the employe does not, within five (5) calendar days after notice to report has been sent to him, either report for work or give a satisfactory reason for his absence, unless it is not possible for him to comply with either of these requirements; and provided at least ten (10) calendar days have elapsed since his last day worked.

"Such notice shall be sent by registered mail to the employe's last known address according to the Company's records, and, *except in cases of recall,* the notice shall be substantially in the form set forth in Appendix B, attached." (Emphasis supplied.)

"APPENDIX B

FIVE-DAY NOTICE

"Our records show that it has been five or more calendar days since you last worked. If you do not, within 5 calendar days from the above date, either report to the Employment Office for work or give a satisfactory

reason for your absence to the Employment Office in writing or by telephone, your employment will be terminated and you will lose your seniority (unless it is impossible or you to comply with the above). * * * "

ARTICLE VIII, Section 29(b), provides leaves of absence as follows:

"Not Over 30 Days

"Leave of absence may be granted *for personal reasons* for a period not to exceed thirty (30) days upon application of the employe and approval of his Foreman.

"(c) Over 30 up to 120 Days

"Leave of absence may be granted for personal reasons for a period not to exceed ninety (90) days upon application of the employe and approval of the Management when the services of the employe are not immediately required and there are employes available at the plant capable of doing his work. * * * Leave of absence may be granted under the foregoing conditions for a period exceeding ninety (90) days but not to exceed 120 days if required for the purpose of traveling to a foreign country. * * *

"(d) Extension

"Leaves of absence may be extended upon the approval of the Employment Office." (Emphasis supplied.)

Appellant's discharge was not a disciplinary discharge. While he was still absent on sick leave—the last day of his sick leave—he was arrested and detained by the Detroit police on a charge of murder. Appellant's wife immediately notified the Ford Company by telephone of his inability to report for work because he was detained by the police. She phoned the Company in compliance with Article X, Section 7, of the Collective Bargaining Agreement providing for such notification by telephone to the Company of appellant's inability to report for work while he was in the custody of the police. How, after compli-

ance with this section of the bargaining contract, could appellant be given a disciplinary discharge by the Ford Company? His inability to report for work is admitted. His notification of such fact to the Ford Company is admitted. By being detained by the police until he was released on bail, appellant had not done anything to the Ford Company. He was not derelict in his duties or services to the Ford Company, and had not committed any act that called for discipline or punishment or penal retribution. Apparently, the Ford Company did not, at that time, consider he was subject to a *disciplinary* discharge. When he was released on bail, about a month after his arrest, he immediately went to the Ford Company with his wife and his Union bargaining representative, Mr. Daniel, and reported for work. After being required to take a physical examination, which he passed, he was then told by Mr. Echols, the labor relations representative of the Ford Company, that he would be reinstated as soon as he was exonerated from the murder charge which was still pending. Nothing was mentioned by Mr. Echols about a discharge or a disciplinary discharge. But four days later, Mr. Echols signed a *"disciplinary"* discharge without notifying appellant. It should be emphasized that *the only discharge of an employee that can be made without notice to him is a "disciplinary" discharge.*

Appellant had done nothing that called for discipline. He had done nothing to bring down upon himself any kind of penal retribution; but the discharge was explicitly stated to be a "penalty," for "unauthorized absence"—although four days before the discharge was filed without notice to appellant, Mr. Echols, who signed the discharge, had assured appellant he would be reemployed as soon as he was exonerated of the criminal charge made against him. Because of the representation made by its labor relations official that appellant would be reemployed as soon as exonerated, Ford's discharge of appellant is invalid.

■ The defense of the Ford Company and the Union is that appellant had failed to exhaust his internal Union-Company grievance procedures, and that this is a condition precedent to the bringing of his suit. Ford claims appellant was given a disciplinary discharge and that, under the collective bargaining agreement, in order to question or set aside the discharge, it must be reversed through the grievance procedure stated in the contract. Aside from the question of whether the discharge was disciplinary, the collective bargaining agreement provides that while the Company may discharge an employee for cause, it will not act wrongfully or unjustly. A discharge for cause means a discharge for good cause. Nowhere does it appear that "cause" or "good cause" was relied upon to discharge appellant. Nowhere does it appear that there were any grounds upon which to base a disciplinary discharge. Under the bargaining contract, an employee may be given a disciplinary discharge without notice to him.

■ Appellant had done nothing to be disciplined for, or punished by the "penalty" of discharge. This fact is, perhaps, unconsciously emphasized by counsel for the Ford Motor Company in his brief in this Court when he pointedly says that "in the event of disciplinary action against an absent employee, notice of the action need be given only to the Union." Calling an ordinary discharge a "disciplinary" discharge does not make it a disciplinary discharge. This was not a disciplinary discharge and, on this record, both Ford and the Union are responsible for the wrongful discharge and the failure of the Union to process the grievance it filed for appellant, beyond the denial.

Appellant was wrongfully discharged since he received from Ford no five-day notice by registered mail that his employment would be terminated unless he reported for work, in accordance with APPENDIX B of the Collective Bargaining Agreement.

■ Ford maintains that it does not have to give any notice to appellant when it discharges him; and its counsel, in the proceedings before the District Court, contended that the five-day written notice by registered mail applies only if an employee fails to report, when there is a lay-off and the Company tells the employees to report back to work and he does not respond. We do not read that the requirement of that notice by registered mail by the Company is limited to recalling employees who have been laid off. In fact, the rule says that such notice shall be sent by registered mail to employees who fail to report, *"except in cases of recall."* In any event, it cannot insist upon a discharged employee's filing a grievance within three days of such a discharge, on penalty of having it dismissed as untimely under the three-day rule, when it gave him no notice of the discharge, or assured him of continued employment, when he was exonerated of the criminal charge. To insist on such a rule and procedure would be inequitable and tyrannical and contrary to an employee's basic rights as a workman and as a human being.

Since we are compelled to assume the truth of all of appellant's allegations of fact, plus the reasonable inferences which flow from those facts and other admitted facts, it is our view that appellant, on the facts before us, was entitled to a notice to report for work to be sent to him by the Company by registered mail, and that the Company's failing to send such notice resulted in an invalid discharge. We are also of the view that since the bargaining contract provided a system whereby an employee was permitted to verify the fact of his inability to report for work by telephone, the Company was not justified in discharging, without notice, an employee who was unable to return to work and who so notified the Company. Since the Company did not discharge appellant during the time he was detained by the police for a period of a month, it is evident that the Company so understood this section of the bargaining contract.

Moreover, after release on bail, when appellant with his Union bargaining agent appeared at the labor relations department of Ford, asking for reinstatement and was told by Mr. Echols, in charge of that department, first, to take a physical examination, and, afterward, was informed that he would be reinstated when exonerated of the criminal charge, the Ford Company was estopped from discharging him, without notice, prior to his exoneration.

▆▆▆ An employer may be estopped from a defense that an employee in a collective bargaining agreement has not exhausted his administrative remedies. In Stroman v. Atchison, Topeka & S. F. R. Co., 161 Cal.App.2d 151, 326 P.2d 155, the court held that an employer was estopped from urging failure on the part of an employee under a collective bargaining agreement, as a defense to wrongful discharge. In the cited case, a superintendent and the clerk to the superintendent of the railroad made representations to a discharged employee as to the official of the railroad to whom employees must protest their grievances. Such official was not the proper official to whom grievances were to be presented under the bargaining agreement, and the railroad was held to be estopped from urging as a defense to an action brought by the discharged employee that she had failed to present her grievance to the proper official. The court said:

"Under the proper interpretation of the Collective Bargaining Agreement are certain fundamental rules of fair play. While the company was under no duty to speak, when it did speak through its responsible agents, it was under a duty to speak the truth and not to mislead the plaintiff to her damage."

The court held that in such a case the company was estopped from urging the defense that the employee failed to exhaust her administrative remedies.

Counsel for the Union says that Mr. Echols was not its authorized agent; but the Company does not make this claim, nor could it well do so, since Mr. Echols was the official in the Ford Labor Relations Department to whom appellant and the Union bargaining agent, Mr. Daniel, reported as soon as appellant was released on bail; it was Mr. Echols who directed appellant to have a physical examination; who, afterward, told appellant he would be reemployed as soon as he was exonerated; who filed the disciplinary discharge, signing it as the Labor Relations Representative; and who later signed the denial of appellant's grievance. Mr. Echols represented and spoke for the Company in all matters that affected appellant in this case.

When the Union bargaining representative in the instant case filed a grievance on behalf of appellant (after he was exonerated by a finding of not guilty), in which the representative set forth facts to support the claim of wrongful discharge, appellant received notice of the denial of the grievance two months later on the ground that it was untimely. Then, before the Union representative could process the grievance further, it was withdrawn from consideration by Union officials. *Instead of protecting appellant's rights by processing the grievance further, the Union destroyed all of appellant's rights to a further hearing* without notice to him.

Appellant contends that it was inequitable for Ford to discharge, without notice, an employee in good standing with the Company and the Union, and who had more than three years' seniority, on the ground of his absence, when appellant informed Ford of his inability to report and Ford insisted on his absence from work until he was exonerated of the criminal charge. Appellant further contends it was inequitable and unfair to the employee to deny his grievance for "unjust discharge" on the ground that the grievance was untimely because the employee had not filed his grievance within three days of his discharge while he was, in keeping with Ford's promise to reinstate him in employment when he was exonerated, awaiting such exoneration by the court, in which he was later found

not guilty of the charge. It was, of course, impossible for appellant to file a timely grievance for an unjust discharge within three days of his discharge, when he had no notice of it and was relying on the Company's promise to reinstate him.

Here it is to be noted that leaves of absence may be extended upon the approval of the Employment Office, according to Article VIII, Section 29(d) of the collective bargaining contract. When, as mentioned, appellant reported for work, after he had been released on bond, on the murder charge, he was given a physical examination by Ford, and was told that he would be reinstated as soon as he was exonerated. At that time, appellant had not been discharged; and the Company's notification to appellant that he would be reinstated in employment at this future time, fixed as of the date of his exoneration, on the record before us, may be considered from an equitable standpoint, to be equivalent to an extension of his leave of absence, as far as the Ford Company and appellant are concerned.

With regard to Mr. Echols, who had appellant take a physical examination when he returned to the Company after being released on bond, and told him that he would be reinstated as soon as he was exonerated, counsel for the Union in his argument before the District Court, which was made a part of the record on appeal, stated that Mr. Echols was no longer with the Company. He declared: "I don't know what happened to him, whether or not he will be available as a witness or whether he is dead or not, but we are told he is a bad man." At this point counsel for appellant informed the Court:

"If it is material, * * * he is still employed in the same position.

"THE COURT: He is?

"MR. JAMES R. JACKSON: Yes."

Counsel for the Union did not contradict this statement. To continue:

"COUNSEL FOR THE UNION: Whatever the case may be in reference to Mr. Echols, let's say that we agree, for the purpose of argument, that he made the statement that he is alleged to have made. * * *

"THE COURT: That is 'Wait until you have been exonerated and—'

"COUNSEL FOR THE UNION: That is right. Let's assume he made that statement, just for the purpose of the argument. * * * *"

This was set out in appellant's pleadings and, on the Union's motion for summary judgment and in this proceeding, it must be accepted as a fact.

"COUNSEL FOR THE UNION: Now, let's put it in the context of the grievance procedure and let's say that Daniels, [the Union committeeman] for no hostile reasons at all, comes to the conclusion erroneously that [Echols] did make the statement or that it is not possible to prove that he made the statement, *or that the grievant's character is so bad, because I understand he has a habit of shooting up people or something,* I don't know exactly how that worked; *my understanding is he was returning from a gun*—that is not in the pleadings, *but let's feel that this man's character was so bad* that it would be impossible to convince a third party between a conflict and Echols. He says 'Look, I believe Echols said it *but I believe it's impossible with a guy like this* to prove it in a grievance procedure,' and so the thing is going to go down and let's say he makes that judgment. * * * I am assuming that Echols made the statement, but that the man in charge of the grievance procedure makes the judgment that I have just indicated and he makes it without hostility, without malice, makes it in good faith." (Emphasis supplied.)

This is a strange argument for a Union to make against one of its own members, who never before had any trouble with the Union—that the Company representative could have assumed that appellant's character was bad, and that counsel understood he had a habit of

"shooting up people," and that one might assume that appellant's character was so bad that it would be impossible to convince a third party in a conflict of testimony between appellant and Mr. Echols. Yet, there is no dispute so far between appellant and Mr. Echols. And there is no evidence whatever of appellant's bad character or habit of "shooting up people."

Mr. Daniel did not come to the conclusion that it was impossible to prove that Mr. Echols made the statement that appellant would be reinstated when exonerated of the charge of murder. So there is no reason to assume that he did, even for purposes of argument. Mr. Daniel did not come to the conclusion that it was impossible to prove that Mr. Echols made the statement because, as counsel for the Union says, "the grievant's character is so bad, because I understand he has a habit of shooting up people or something." The actual fact is that Mr. Daniel had no doubts whatever about appellant's right to reinstatement. It was Mr. Daniel, himself, who filed and signed, as bargaining agent committeeman, the grievance on behalf of appellant on February 9, 1970, in the language shown in the footnote,[1] after appellant was found not guilty of murder or manslaughter. And Mr. Daniel never lost faith in appellant or never had any doubt of appellant's rights to reinstatement. It was not Mr. Daniel that gave up on the case. Appealing Echols' denial of appellant's grievance was taken out of his hands by the three nameless Union committeemen, who withdrew the grievance from further consideration without disclosing any reasons and without notice to appellant.

The arguments of the Company and the Union in this case cast a cloud upon their action resulting in the deprivation of appellant of his employment and the livelihood of himself, his wife, and of his children.

The man who was killed by appellant was a Negro Union official in the same Local as appellant and, as heretofore stated, this man called appellant by telephone and told him he was on his way over to his home to kill him. Appellant, in self-defense, shot and killed this Union official and, after a trial, was found not guilty of murder or of manslaughter. Did the fact that appellant shot in self-defense a Union official of the same Local justify his discharge and refusal of reinstatement, in spite of the fact that appellant was found not guilty of manslaughter or murder, and shot only in defense of himself and of his family? The Company and the Union do not rely upon appellant's conduct in this affair to jus-

1. "On 2–8–70 Mr. Day did return to the Ford Mo. Co. seeking reinstatement with all rights under U.A.W. contract.

The aggrieved was discharged from the Ford Mo. Co. on 1–16–69 for A.W.O.L. The Union contends the aggrieved was detained by the Det. Police dept. from 12–13–68 to 1–11–69. Where upon he returned to Ford Wixom plant to report for work. Lab. Rel. held a case for Abs and discharged him. The statement was made to him if he was found not guilty he would be reinstated.

On 2–5–70 the aggrieved was found not guilty of the charge of Man Slaughter.

On 2–9–70 he returned to Fo. Mo. seeking his job by being reinstated with full seniority.

*The Adjustment Requested:* The aggrieved be reinstated with full sen. and all pay for hours worked by Dept. 60 paint sprayers from 1–16–69 until reinstatement.

*Signed (Bargaining Committee)* L. L. Daniel"

On the reverse side of the foregoing statement, Mr. Daniel continued:

"On 2–9–70 Lab. Rel. said you have been discharged there is no more work for you.

This statement was made by Mike the clerk in the employment office.

The aggrieved acted in defense of his life and protection of his family.

In view of this being a employee of the Fo. Mo. Co. that the aggrieved had the trouble with the Co. felt discharge was the best for all conserned.

The union contends the aggrieved could not report from 12–13–68 until 1–10–69 because of detention therefore was not abs. of his on will.

The aggrieved was on med leave from 8–12–68 to 12–13–68. When he was incarcirated his Med. Leave was cancelled.

There was no 5 day notice sent."

tify his discharge. They do not even criticize appellant for his conduct. Counsel for the Union stated in his argument to the District Court that Ford had cause for discharging appellant because of his absence, regardless of the reason, although such a discharge rested in the discretion of the Company.

It is contended by Ford Motor Company that appellant was discharged on January 16, 1969, by the Company; that the disposition of his grievance, according to the grievance procedure agreed on by the Company and the Union, was binding on appellant; that, in the absence of stating a breach of duty by the Union under the collective bargaining agreement, no cause of action was stated; and that the exhaustion of available internal Union remedies is a necessary prerequisite to appellant's suit against the Union or against Ford.

The Union contends that appellant has failed to state facts constituting a claim on which relief could be granted; that he has failed to exhaust his contractual remedies, in that he has failed to exhaust his internal Union grievance procedures, which is a condition to the bringing of his suit.

When appellant was given a disciplinary discharge on January 16, 1969, the Union bargaining agent was informed. But the Union did nothing at that time to file a grievance, the Union bargaining agent obviously relying on the Ford Labor Relations Officer's statement that appellant would be reemployed when he was exonerated from the murder charge, and not considering that the action was a discharge in view of the promise of reinstatement. However, nothing was done at the time of the discharge to file a grievance based on the Labor Relations Officer's discharge. Then, when appellant was exonerated, and appeared at the Ford Company's office on February 9, 1970, he was told he had been discharged and there was no work for him. When appellant caused Mr. Daniel to file a grievance based on the statement and promise of the Officer in Ford's Labor Relations Department that

he would be reemployed, the grievance was denied on March 6, 1970. At that time, the three Union plant committeemen withdrew the grievance from further consideration without consulting appellant and, for all one knows, without ever reading the grievance. The grievance could not, therefore, be processed further. For several months appellant did not know what had happened, and learned of it only when he called Mr. Daniel and was told nothing more could be done. Where the Union's refusal to act for an employee in a grievance procedure is arbitrary, the Union cannot take advantage of relying on the discharged employee's failure to exhaust the remedies provided by the contract.

The general rule, of course, is that every available remedy within the labor organization must be exhausted by an employee before the aid of the courts can be invoked. But this requirement must be given a reasonable and common-sense application to the facts of each case; and this is an exceptional case.

We are of the view that estoppel on the part of the Company to defend on the ground that appellant did not pursue his administrative remedies, is one of the important and controlling considerations. On the record before us, when appellant, upon his release on bail, immediately went to the Labor Relations Department of Ford, reporting for work, and was directed by Mr. Echols of that Department to take a physical examination, which he did, and passed, and was thereupon told to report for work as soon as he was exonerated of the original charge, and that, at that time he would be reemployed, the Ford Company was estopped from discharging him, without notice to him for his absence during the prior 30 days when he was detained by the police; and further was estopped from refusing him employment when he was exonerated from the charge.

Moreover, with regard to the claimed right to give appellant a discharge because of his absence during the month between his detention by the police, and

his reporting for work at the time he was released on bail, we consider, under the terms of the bargaining contract hereinafter mentioned, that this absence was excusable and that appellant was entitled to be excused. The bargaining contract provides that in disciplining and discharging employees for cause, it will not act wrongfully or unjustly in violation of the terms of the agreement. The contract, however, goes on to say that a system shall be established which will permit an employee to verify the fact that he has notified the Company by telephone of his inability to work. The only conclusion to be drawn from this rule is that if the employee is unable to work and so notifies the Company by telephone, his absence, because of such inability, is excused, at least until further notice from the Company.

In addition, the rules make provision for an employee who either does not report for work or gives a satisfactory reason for his absence, *unless it is impossible for him to comply with these requirements.* The notice to be sent such employee, according to the bargaining contract, provides that if such employee does not report to the Employment Office for work or *give a satisfactory reason for his absence* to the Employment Office in writing or by telephone, his employment will be terminated and he will lose his seniority *unless it is impossible for him to comply with such requirements.* So the only reasonable conclusion to draw from the foregoing is that if he gives a reasonable excuse for his absence, his absence is excused, at least until further notice from the Company.

Appellant complied with the requirement of notifying the Company, by telephone, that he was unable to work, or report for work, because of his detention by the police on a charge of which he was found not guilty. At a time when he had a medical leave of absence, his notice to the Company that he was unable to report for work was in accordance with the bargaining contract provisions. His absence was excusable, and excused, at

least until further notice from the Company.

Appellant's discharge could not be a "disciplinary" discharge. A disciplinary discharge is provided for in Article VII of the Collective Bargaining Agreement, heretofore quoted. Section 5(b), relating to disciplinary discharges, provides:

"(b) Waiver of Representation

"When an employe signifies he does not want his Committeeman present at a disciplinary hearing, he shall sign a waiver to that effect."

The foregoing implies there will be a disciplinary hearing. There was no such hearing. Appellant never had any notice of his disciplinary discharge until a year later. His discharge could not have been a disciplinary discharge because there was nothing for which to discipline him.

Counsel for Ford says:

"The Plaintiff refers to the fact that the grievance was not filed on a timely basis because he alleges that he was told that when he was exonerated * * *, he would be reemployed. * * * [B]ut it is not important for this proceeding to consider whether or not that statement was made because, if it was made, it would only apply to the merits of his grievance and whether or not there was some excuse for meeting the time limits which is, in itself, a matter for review in the Grievance Procedure and for arbitration if the Union chooses to carry it that far."

■ But, under the state of the record in this case, we must hold that appellant was told he would be reemployed when he was exonerated; and the Ford Company is estopped from discharging him without notice three days after it was represented to him by the Company that he would be reemployed when he was exonerated.

■ The other basis of estoppel is with reference to the denial of appellant's grievance. Appellant's grievance

was based on the "Unjust Penalty" of discharge for "Unauthorized Absence." On the record before us, the Company is estopped from denying appellant's grievance on the ground of untimeliness, since under the contract he was allowed only three days after discharge to file the grievance, and the Company had misled him into relying on reemployment whenever he would be exonerated and, instead, had thereafter discharged him without notice.

In conclusion, we are confronted by these facts that control our decision on the record before us: Appellant's wife, on the last day of his sick leave, called the Ford Company, told them appellant was then being detained by the police and was not able to report for work. A month later appellant was released on bail, and immediately went to the Ford Company to return to work. Mr. Echols, of the Labor Relations Department of the Company, required that appellant take a physical examination, which he passed. Mr. Echols then told appellant he would be reemployed as soon as he was exonerated from the criminal charge. Five days after Mr. Echols told appellant that he would be reemployed, he signed a "disciplinary" discharge of appellant without telling him.

Approximately one year later appellant was found not guilty of the criminal charge, and immediately returned to the Ford Company to report for work. At that time appellant was told by the Employment Office that he had been discharged and that there was no work for him there. Appellant, at once, got Mr. Daniel, his Union bargaining plant committeeman, to file a grievance, claiming appellant's discharge was an unjust penalty and seeking reinstatement. Mr. Daniel made a strong statement setting forth appellant's arrest by police, and his detention from December 12, 1968, to January 11, 1969; reciting the statement made to appellant by the Ford Labor Relations Department, on January 11, 1969, that appellant would be reinstated if he were found not guilty. Mr. Daniel further stated in the grievance

filed that the Company felt appellant's discharge was "the best for all concerned," because the man killed by appellant in self-defense had also been an employee of the Ford Motor Company. Certainly, Mr. Daniel, as a Union man, did his duty well in filing the grievance for appellant.

About two months after the grievance was filed, the grievance was denied by Mr. Echols with the notation: "Grievance Untimely," because it had not been filed within three days of appellant's discharge the year before. Afterward, in spite of Mr. Daniel's prior efforts, as a representative of the Union, on behalf of appellant, the three Union committeemen, whose names do not appear in the record, approved the denial of the grievance, and thereupon withdrew it from further consideration.

Here then, was one Union man, the bargaining committeeman—Mr. Daniel —doing everything he could to have appellant reemployed and trying to set aside an "unjust Penalty" of discharge, through the grievance he filed on behalf of appellant, while, as soon as Mr. Echols, for the Company, denied the grievance, there were three Union committeemen who withdrew the grievance and so denied appellant the right of further consideration and review.

 Under the circumstances of this case the withdrawal by the three Union committeemen of appellant's grievance (which was prepared by Mr. Daniel, the Union bargaining agent)—without notice to appellant, without hearing, and without reasons, and in the light of the facts that must be considered as admitted, on the record before us, there is presented a question of fact for the jury as to whether such action was arbitrary and in bad faith, in breach of the Union's duty of fair representation. Further, the question as to whether the claimed representations, constituting estoppel, were made by the Company that appellant would be reemployed when exonerated; whether such representations, if made, were reasonably considered to be the equivalent of a leave of absence

until appellant was exonerated; and whether the Company acted in bad faith to appellant's detriment and damage—all these questions are for the jury on the retrial of the case.

The facts, as disclosed by the pleadings, surrounding all events subsequent to Day's release on bond, are in dispute. Since these facts are relevant to the material issues of whether the discharge was unlawful and whether the Union breached its duty of fair representation, the award of summary judgment should be vacated. "On a motion for summary judgment, it is not for the court to resolve factual issues. In deciding whether there is an issue of material fact in the case, all doubts must be resolved against the party moving for a summary judgment." Cox v. American Fidelity & Casualty Co., 249 F.2d 616, 619 (C.A.9).

In accordance with the foregoing, the order of the District Court granting summary judgment is vacated and the case remanded for a trial on the merits.

PHILLIPS, Chief Judge (concurring in the result).

The record before the District Court consisted of the pleadings, motions for and in opposition to summary judgment and affidavits from all parties. Upon consideration of this material, we can not say "that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." See Rule 56(c), Fed.R.Civ.P.

I concur in the conclusion that there are genuine issues of material fact requiring reversal of the summary judgment. ·Material facts concerning events subsequent to Day's release on bond are in dispute. These facts are relevant to the issue of whether the discharge of Day was unlawful and whether the Union breached its duty of fair representation. I therefore agree that the order granting summary judgment be vacated and the case remanded to the District Court for a trial on the merits.

## ORDER DENYING PETITIONS FOR REHEARING

The petitions for rehearing having come on to be heard, upon due consideration, it is ordered that the petitions be, and are hereby denied.

All facts in the case are in dispute and will be determined on remand.

Chief Judge PHILLIPS is of the opinion that the petitions for rehearing should be granted; that the majority and concurring opinions of this Court should be withdrawn; that the order granting summary judgment should be vacated and the case remanded to the District Court for trial on the merits.